# SIMON & SCHUSTER, INC. *v.* MEMBERS OF THE NEW YORK STATE CRIME VICTIMS BOARD ET AL.

No. 90–1059.   Argued October 15, 1991—Decided December 10, 1991

106

O'CONNOR, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and WHITE, STEVENS, SCALIA, and SOUTER, JJ., joined. BLACKMUN, J., *post*, p. 123, and KENNEDY, J., *post*, p. 124, filed opinions concurring in the judgment. THOMAS, J., took no part in the consideration or decision of the case.

*Ronald S. Rauchberg* argued the cause for petitioner. With him on the briefs were *Charles S. Sims* and *Mark C. Morril.*

*Howard L. Zwickel,* Assistant Attorney General of New York, argued the cause for respondents. With him on the brief were *Robert Abrams,* Attorney General, *O. Peter Sherwood,* Solicitor General, and *Susan L. Watson,* Assistant Attorney General.*

---

*Briefs of *amici curiae* urging reversal were filed for the American Civil Liberties Union et al. by *Leon Friedman, Steven R. Shapiro, John A. Powell,* and *Arthur N. Eisenberg;* for the Association of American Publishers, Inc., by *R. Bruce Rich;* and for the Motion Picture Association of America, Inc., by *Richard M. Cooper, David E. Kendall,* and *Walter J. Josiah, Jr.*

Briefs of *amici curiae* urging affirmance were filed for the State of Florida et al. by *Robert A. Butterworth,* Attorney General of Florida, and *Louis F. Hubener* and *Charles A. Finkel,* Assistant Attorneys General, and by the Attorneys General for their respective States as follows: *Jimmy Evans* of Alabama, *Charles E. Cole* of Alaska, *Daniel E. Lungren* of California, *Gale E. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Charles M. Oberly III* of Delaware, *Michael J. Bowers* of Georgia, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Linley E. Pearson* of Indiana, *Robert T. Stephan* of Kansas, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Frank J. Kelley* of Michigan, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *William L. Webster* of Missouri, *Marc Racicot* of Montana, *Don Stenberg* of Nebraska, *Frankie Sue Del Papa* of Nevada, *John P. Arnold* of New Hampshire, *Robert J. Del Tufo* of New Jersey, *Lacy H. Thornburg* of North Carolina, *Lee Fisher* of Ohio, *Robert H. Henry* of Oklahoma, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, *Charles W. Burson* of Tennessee, *Paul Van Dam* of Utah, *Jeffrey L. Amestoy* of Vermont, *Mary Sue Terry* of Virginia, and *Joseph B. Meyer* of Wyoming; and for the Council of State Governments et al. by *Richard Ruda* and *Randal S. Milch.*

Briefs of *amici curiae* were filed for the United States by *Solicitor General Starr, Assistant Attorneys General Gerson* and *Mueller, Deputy*

JUSTICE O'CONNOR delivered the opinion of the Court.

New York's "Son of Sam" law requires that an accused or convicted criminal's income from works describing his crime be deposited in an escrow account. These funds are then made available to the victims of the crime and the criminal's other creditors. We consider whether this statute is consistent with the First Amendment.

## I

### A

In the summer of 1977, New York was terrorized by a serial killer popularly known as the Son of Sam. The hunt for the Son of Sam received considerable publicity, and by the time David Berkowitz was identified as the killer and apprehended, the rights to his story were worth a substantial amount. Berkowitz's chance to profit from his notoriety while his victims and their families remained uncompensated did not escape the notice of New York's Legislature. The State quickly enacted the statute at issue, N. Y. Exec. Law § 632–a (McKinney 1982 and Supp. 1991).

The statute was intended to "ensure that monies received by the criminal under such circumstances shall first be made available to recompense the victims of that crime for their loss and suffering." Assembly Bill Memorandum Re: A 9019, July 22, 1977, reprinted in Legislative Bill Jacket, 1977 N. Y. Laws, ch. 823. As the author of the statute explained: "It is abhorrent to one's sense of justice and decency that an individual . . . can expect to receive large sums of money for his story once he is captured—while five people are dead, [and] other people were injured as a result of his conduct."

*Solicitor General Shapiro*, and *Ronald J. Mann;* for the Crime Victims Legal Clinic by *Judith Rowland;* for the National Organization for Victim Assistance et al. by *Charles G. Brown III;* and for the Washington Legal Foundation et al. by *Daniel J. Popeo, Richard A. Samp*, and *Jonathan K. Van Patten.*

Memorandum of Sen. Emanuel R. Gold, reprinted in New York State Legislative Annual, 1977, p. 267.

The Son of Sam law, as later amended, requires any entity contracting with an accused or convicted person for a depiction of the crime to submit a copy of the contract to respondent New York State Crime Victims Board (Board), and to turn over any income under that contract to the Board. This requirement applies to all such contracts in any medium of communication:

> "Every person, firm, corporation, partnership, association or other legal entity contracting with any person or the representative or assignee of any person, accused or convicted of a crime in this state, with respect to the reenactment of such crime, by way of a movie, book, magazine article, tape recording, phonograph record, radio or television presentation, live entertainment of any kind, or from the expression of such accused or convicted person's thoughts, feelings, opinions or emotions regarding such crime, shall submit a copy of such contract to the board and pay over to the board any moneys which would otherwise, by terms of such contract, be owing to the person so accused or convicted or his representatives." N. Y. Exec. Law § 632–a(1) (McKinney 1982).

The Board is then required to deposit the payment in an escrow account "for the benefit of and payable to any victim . . . provided that such victim, within five years of the date of the establishment of such escrow account, brings a civil action in a court of competent jurisdiction and recovers a money judgment for damages against such [accused or convicted] person or his representatives." *Ibid.* After five years, if no actions are pending, "the board shall immediately pay over any moneys in the escrow account to such person or his legal representatives." § 632–a(4). This 5-year period in which to bring a civil action against the convicted

person begins to run when the escrow account is established, and supersedes any limitations period that expires earlier. § 632–a(7).

Subsection (8) grants priority to two classes of claims against the escrow account. First, upon a court order, the Board must release assets "for the exclusive purpose of retaining legal representation." § 632–a(8). In addition, the Board has the discretion, after giving notice to the victims of the crime, to "make payments from the escrow account to a representative of any person accused or convicted of a crime for the necessary expenses of the production of the moneys paid into the escrow account." *Ibid.* This provision permits payments to literary agents and other such representatives. Payments under subsection (8) may not exceed one-fifth of the amount collected in the account. *Ibid.*

Claims against the account are given the following priorities: (a) payments ordered by the Board under subsection (8); (b) subrogation claims of the State for payments made to victims of the crime; (c) civil judgments obtained by victims of the crime; and (d) claims of other creditors of the accused or convicted person, including state and local tax authorities. N. Y. Exec. Law § 632–a(11) (McKinney Supp. 1991).

Subsection (10) broadly defines "person convicted of a crime" to include "any person convicted of a crime in this state either by entry of a plea of guilty or by conviction after trial *and any person who has voluntarily and intelligently admitted the commission of a crime for which such person is not prosecuted.*" § 632–a(10)(b) (emphasis added). Thus a person who has never been accused or convicted of a crime in the ordinary sense, but who admits in a book or other work to having committed a crime, is within the statute's coverage.

As recently construed by the New York Court of Appeals, however, the statute does not apply to victimless crimes. *Children of Bedford, Inc.* v. *Petromelis,* 77 N. Y. 2d 713, 726, 573 N. E. 2d 541, 548 (1991).

The Son of Sam law supplements pre-existing statutory schemes authorizing the Board to compensate crime victims for their losses, see N. Y. Exec. Law § 631 (McKinney 1982 and Supp. 1991), permitting courts to order the proceeds of crime forfeited to the State, see N. Y. Civ. Prac. Law §§ 1310–1352 (McKinney Supp. 1991), providing for orders of restitution at sentencing, N. Y. Penal Law § 60.27 (McKinney 1987), and affording prejudgment attachment procedures to ensure that wrongdoers do not dissipate their assets, N. Y. Civ. Prac. Law §§ 6201–6226 (McKinney 1980 and Supp. 1991). The escrow arrangement established by the Son of Sam law enhances these provisions only insofar as the accused or convicted person earns income within the scope of § 632–a(1).

Since its enactment in 1977, the Son of Sam law has been invoked only a handful of times. As might be expected, the individuals whose profits the Board has sought to escrow have all become well known for having committed highly publicized crimes. These include Jean Harris, the convicted killer of "Scarsdale Diet" Doctor Herman Tarnower; Mark David Chapman, the man convicted of assassinating John Lennon; and R. Foster Winans, the former Wall Street Journal columnist convicted of insider trading. Ironically, the statute was never applied to the Son of Sam himself; David Berkowitz was found incompetent to stand trial, and the statute at that time applied only to criminals who had actually been convicted. N. Y. Times, Feb. 20, 1991, p. B8, col. 4. According to the Board, Berkowitz voluntarily paid his share of the royalties from the book Son of Sam, published in 1981, to his victims or their estates. Brief for Respondents 8, n. 13.

This case began in 1986, when the Board first became aware of the contract between petitioner Simon & Schuster and admitted organized crime figure Henry Hill.

112

Looking back from the safety of the Federal Witness Protection Program, Henry Hill recalled: "At the age of twelve my ambition was to be a gangster. To be a wiseguy. To me being a wiseguy was better than being president of the United States." N. Pileggi, Wiseguy: Life in a Mafia Family 19 (1985) (hereinafter Wiseguy). Whatever one might think of Hill, at the very least it can be said that he realized his dreams. After a career spanning 25 years, Hill admitted engineering some of the most daring crimes of his day, including the 1978–1979 Boston College basketball point-shaving scandal, and the theft of $6 million from Lufthansa Airlines in 1978, the largest successful cash robbery in American history. Wiseguy 9. Most of Hill's crimes were more banausic: He committed extortion, he imported and distributed narcotics, and he organized numerous robberies.

Hill was arrested in 1980. In exchange for immunity from prosecution, he testified against many of his former colleagues. Since his arrest, he has lived under an assumed name in an unknown part of the country.

In August 1981, Hill entered into a contract with author Nicholas Pileggi for the production of a book about Hill's life. The following month, Hill and Pileggi signed a publishing agreement with Simon & Schuster, Inc. Under the agreement, Simon & Schuster agreed to make payments to both Hill and Pileggi. Over the next few years, according to Pileggi, he and Hill "talked at length virtually every single day, with not more than an occasional Sunday or holiday skipped. We spent more than three hundred hours together; my notes of conversations with Henry occupy more than six linear file feet." App. 27. Because producing the book required such a substantial investment of time and effort, Hill sought compensation. *Ibid.*

The result of Hill and Pileggi's collaboration was Wiseguy, which was published in January 1986. The book depicts, in colorful detail, the day-to-day existence of organized crime,

primarily in Hill's first-person narrative. Throughout Wiseguy, Hill frankly admits to having participated in an astonishing variety of crimes. He discusses, among other things, his conviction of extortion and the prison sentence he served. In one portion of the book, Hill recounts how members of the Mafia received preferential treatment in prison:

"The dorm was a separate three-story building outside the wall, which looked more like a Holiday Inn than a prison. There were four guys to a room, and we had comfortable beds and private baths. There were two dozen rooms on each floor, and each of them had mob guys living in them. It was like a wiseguy convention—the whole Gotti crew, Jimmy Doyle and his guys, 'Ernie Boy' Abbamonte and 'Joe Crow' Delvecchio, Vinnie Aloi, Frank Cotroni.

"It was wild. There was wine and booze, and it was kept in bath-oil or after-shave jars. The hacks in the honor dorm were almost all on the take, and even though it was against the rules, we used to cook in our rooms. Looking back, I don't think Paulie went to the general mess five times in the two and a half years he was there. We had a stove and pots and pans and silverware stacked in the bathroom. We had glasses and an ice-water cooler where we kept the fresh meats and cheeses. When there was an inspection, we stored the stuff in the false ceiling, and once in a while, if it was confiscated, we'd just go to the kitchen and get new stuff.

"We had the best food smuggled into our dorm from the kitchen. Steaks, veal cutlets, shrimp, red snapper. Whatever the hacks could buy, we ate. It cost me two, three hundred a week. Guys like Paulie spent five hundred to a thousand bucks a week. Scotch cost thirty dollars a pint. The hacks used to bring it inside the walls in their lunch pails. We never ran out of booze, because we had six hacks bringing it in six days a week. Depending on what you wanted and how much you were

willing to spend, life could be almost bearable." Wise-guy 150–151.

Wiseguy was reviewed favorably: The Washington Post called it an "'amply detailed and entirely fascinating book that amounts to a piece of revisionist history,'" while New York Daily News columnist Jimmy Breslin named it "'the best book on crime in America ever written.'" App. 5. The book was also a commercial success: Within 19 months of its publication, more than a million copies were in print. A few years later, the book was converted into a film called Goodfellas, which won a host of awards as the best film of 1990.

From Henry Hill's perspective, however, the publicity generated by the book's success proved less desirable. The Crime Victims Board learned of Wiseguy in January 1986, soon after it was published.

## C

On January 31, the Board notified Simon & Schuster: "It has come to our attention that you may have contracted with a person accused or convicted of a crime for the payment of monies to such person." App. 86. The Board ordered Simon & Schuster to furnish copies of any contracts it had entered into with Hill, to provide the dollar amounts and dates of all payments it had made to Hill, and to suspend all payments to Hill in the future. Simon & Schuster complied with this order. By that time, Simon & Schuster had paid Hill's literary agent $96,250 in advances and royalties on Hill's behalf, and was holding $27,958 for eventual payment to Hill.

The Board reviewed the book and the contract, and on May 21, 1987, issued a proposed determination and order. The Board determined that Wiseguy was covered by §632–a of the Executive Law, that Simon & Schuster had violated the law by failing to turn over its contract with Hill to the Board and by making payments to Hill, and that all money owed to

Hill under the contract had to be turned over to the Board to be held in escrow for the victims of Hill's crimes. The Board ordered Hill to turn over the payments he had already received, and ordered Simon & Schuster to turn over all money payable to Hill at the time or in the future.

Simon & Schuster brought suit in August 1987, under 42 U. S. C. § 1983, seeking a declaration that the Son of Sam law violates the First Amendment and an injunction barring the statute's enforcement. After the parties filed cross-motions for summary judgment, the District Court found the statute to be consistent with the First Amendment. 724 F. Supp. 170 (SDNY 1989). A divided Court of Appeals affirmed. *Simon & Schuster, Inc.* v. *Fischetti,* 916 F. 2d 777 (CA2 1990).

Because the Federal Government and most of the States have enacted statutes with similar objectives, see 18 U. S. C. § 3681; Note, *Simon & Schuster, Inc. v. Fischetti:* Can New York's Son of Sam Law Survive First Amendment Challenge?, 66 Notre Dame L. Rev. 1075, n. 6 (1991) (listing state statutes), the issue is significant and likely to recur. We accordingly granted certiorari, 498 U. S. 1081 (1991), and we now reverse.

## II

### A

A statute is presumptively inconsistent with the First Amendment if it imposes a financial burden on speakers because of the content of their speech. *Leathers* v. *Medlock,* 499 U. S. 439, 447 (1991). As we emphasized in invalidating a content-based magazine tax: "[O]fficial scrutiny of the content of publications as the basis for imposing a tax is entirely incompatible with the First Amendment's guarantee of freedom of the press." *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 230 (1987).

This is a notion so engrained in our First Amendment jurisprudence that last Term we found it so "obvious" as to

not require explanation. *Leathers, supra,* at 447. It is but one manifestation of a far broader principle: "Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment." *Regan* v. *Time, Inc.,* 468 U. S. 641, 648–649 (1984). See also *Police Dept. of Chicago* v. *Mosley,* 408 U. S. 92, 95 (1972). In the context of financial regulation, it bears repeating, as we did in *Leathers,* that the government's ability to impose content-based burdens on speech raises the specter that the government may effectively drive certain ideas or viewpoints from the marketplace. 499 U. S., at 448–449. The First Amendment presumptively places this sort of discrimination beyond the power of the government. As we reiterated in *Leathers:* " 'The constitutional right of free expression is . . . intended to remove governmental restraints from the arena of public discussion, putting the decision as to what views shall be voiced largely into the hands of each of us . . . in the belief that no other approach would comport with the premise of individual dignity and choice upon which our political system rests.' " *Id.,* at 448–449 (quoting *Cohen* v. *California,* 403 U. S. 15, 24 (1971)).

The Son of Sam law is such a content-based statute. It singles out income derived from expressive activity for a burden the State places on no other income, and it is directed only at works with a specified content. Whether the First Amendment "speaker" is considered to be Henry Hill, whose income the statute places in escrow because of the story he has told, or Simon & Schuster, which can publish books about crime with the assistance of only those criminals willing to forgo remuneration for at least five years, the statute plainly imposes a financial disincentive only on speech of a particular content.

The Board tries unsuccessfully to distinguish the Son of Sam law from the discriminatory tax at issue in *Arkansas Writers' Project.* While the Son of Sam law escrows all of the speaker's speech-derived income for at least five years,

rather than taxing a percentage of it outright, this difference can hardly serve as the basis for disparate treatment under the First Amendment. Both forms of financial burden operate as disincentives to speak; indeed, in many cases it will be impossible to discern in advance which type of regulation will be more costly to the speaker.

The Board next argues that discriminatory financial treatment is suspect under the First Amendment only when the legislature intends to suppress certain ideas. This assertion is incorrect; our cases have consistently held that "[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment." *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue,* 460 U. S. 575, 592 (1983). Simon & Schuster need adduce "no evidence of an improper censorial motive." *Arkansas Writers' Project, supra,* at 228. As we concluded in *Minneapolis Star:* "We have long recognized that even regulations aimed at proper governmental concerns can restrict unduly the exercise of rights protected by the First Amendment." 460 U. S., at 592.

Finally, the Board claims that even if the First Amendment prohibits content-based financial regulation specifically of the *media,* the Son of Sam law is different, because it imposes a general burden on any "entity" contracting with a convicted person to transmit that person's speech. Cf. *Cohen* v. *Cowles Media Co.,* 501 U. S. 663, 670 (1991) ("[E]nforcement of . . . general laws against the press is not subject to stricter scrutiny than would be applied to enforcement against other persons or organizations"). This argument falters on both semantic and constitutional grounds. Any "entity" that enters into such a contract becomes by definition a medium of communication, if it was not one already. In any event, the characterization of an entity as a member of the "media" is irrelevant for these purposes. The government's power to impose content-based financial disincentives on speech surely does not vary with the identity of the speaker.

The Son of Sam law establishes a financial disincentive to create or publish works with a particular content. In order to justify such differential treatment, "the State must show that its regulation is necessary to serve a compelling state interest and is narrowly drawn to achieve that end." *Arkansas Writers' Project*, 481 U. S., at 231.

### B

The Board disclaims, as it must, any state interest in suppressing descriptions of crime out of solicitude for the sensibilities of readers. See Brief for Respondents 38, n. 38. As we have often had occasion to repeat: "'[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection.'" *Hustler Magazine, Inc.* v. *Falwell*, 485 U. S. 46, 55 (1988) (quoting *FCC* v. *Pacifica Foundation*, 438 U. S. 726, 745 (1978)). "'If there is a bedrock principle underlying the First Amendment, it is that the Government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable.'" *United States* v. *Eichman*, 496 U. S. 310, 319 (1990) (quoting *Texas* v. *Johnson*, 491 U. S. 397, 414 (1989)). The Board thus does not assert any interest in limiting whatever anguish Henry Hill's victims may suffer from reliving their victimization.

There can be little doubt, on the other hand, that the State has a compelling interest in ensuring that victims of crime are compensated by those who harm them. Every State has a body of tort law serving exactly this interest. The State's interest in preventing wrongdoers from dissipating their assets before victims can recover explains the existence of the State's statutory provisions for prejudgment remedies and orders of restitution. See N. Y. Civ. Prac. Law §§ 6201–6226 (McKinney 1980 and Supp. 1991); N. Y. Penal Law

§ 60.27 (McKinney 1987). We have recognized the importance of this interest before, in the Sixth Amendment context. See *Caplin & Drysdale, Chartered* v. *United States*, 491 U. S. 617, 629 (1989).

The State likewise has an undisputed compelling interest in ensuring that criminals do not profit from their crimes. Like most if not all States, New York has long recognized the "fundamental equitable principle," *Children of Bedford* v. *Petromelis*, 77 N. Y. 2d, at 727, 573 N. E. 2d, at 548, that "[n]o one shall be permitted to profit by his own fraud, or to take advantage of his own wrong, or to found any claim upon his own iniquity, or to acquire property by his own crime." *Riggs* v. *Palmer*, 115 N. Y. 506, 511–512, 22 N. E. 188, 190 (1889). The force of this interest is evidenced by the State's statutory provisions for the forfeiture of the proceeds and instrumentalities of crime. See N. Y. Civ. Prac. Law §§ 1310–1352 (McKinney Supp. 1991).

The parties debate whether book royalties can properly be termed the profits of crime, but that is a question we need not address here. For the purposes of this case, we can assume without deciding that the income escrowed by the Son of Sam law represents the fruits of crime. We need only conclude that the State has a compelling interest in depriving criminals of the profits of their crimes, and in using these funds to compensate victims.

The Board attempts to define the State's interest more narrowly, as "ensuring that criminals do not profit from storytelling about their crimes before their victims have a meaningful opportunity to be compensated for their injuries." Brief for Respondents 46. Here the Board is on far shakier ground. The Board cannot explain why the State should have any greater interest in compensating victims from the proceeds of such "storytelling" than from any of the criminal's other assets. Nor can the Board offer any justification for a distinction between this expressive activity and

any other activity in connection with its interest in transferring the fruits of crime from criminals to their victims. Thus even if the State can be said to have an interest in classifying a criminal's assets in this manner, that interest is hardly compelling.

We have rejected similar assertions of a compelling interest in the past. In *Arkansas Writers' Project* and *Minneapolis Star*, we observed that while the State certainly has an important interest in raising revenue through taxation, that interest hardly justified selective taxation of the press, as it was completely unrelated to a press/nonpress distinction. *Arkansas Writers' Project, supra*, at 231; *Minneapolis Star*, 460 U. S., at 586. Likewise, in *Carey* v. *Brown*, 447 U. S. 455, 467–469 (1980), we recognized the State's interest in preserving privacy by prohibiting residential picketing, but refused to permit the State to ban only nonlabor picketing. This was because "nothing in the content-based labor-nonlabor distinction has any bearing whatsoever on privacy." *Id.*, at 465. Much the same is true here. The distinction drawn by the Son of Sam law has nothing to do with the State's interest in transferring the proceeds of crime from criminals to their victims.

Like the government entities in the above cases, the Board has taken the *effect* of the statute and posited that effect as the State's interest. If accepted, this sort of circular defense can sidestep judicial review of almost any statute, because it makes all statutes look narrowly tailored. As Judge Newman pointed out in his dissent from the opinion of the Court of Appeals, such an argument "eliminates the entire inquiry concerning the validity of content-based discriminations. Every content-based discrimination could be upheld by simply observing that the state is anxious to regulate the designated category of speech." 916 F. 2d, at 785.

In short, the State has a compelling interest in compensating victims from the fruits of the crime, but little if any interest in limiting such compensation to the proceeds of the

wrongdoer's speech about the crime. We must therefore determine whether the Son of Sam law is narrowly tailored to advance the former, not the latter, objective.

C

As a means of ensuring that victims are compensated from the proceeds of crime, the Son of Sam law is significantly overinclusive. As counsel for the Board conceded at oral argument, the statute applies to works on *any* subject, provided that they express the author's thoughts or recollections about his crime, however tangentially or incidentally. See Tr. of Oral Arg. 30, 38; see also App. 109. In addition, the statute's broad definition of "person convicted of a crime" enables the Board to escrow the income of any author who admits in his work to having committed a crime, whether or not the author was ever actually accused or convicted. § 632–a(10)(b).

These two provisions combine to encompass a potentially very large number of works. Had the Son of Sam law been in effect at the time and place of publication, it would have escrowed payment for such works as The Autobiography of Malcolm X, which describes crimes committed by the civil rights leader before he became a public figure; Civil Disobedience, in which Thoreau acknowledges his refusal to pay taxes and recalls his experience in jail; and even the Confessions of Saint Augustine, in which the author laments "my past foulness and the carnal corruptions of my soul," one instance of which involved the theft of pears from a neighboring vineyard. See A. Haley & Malcolm X, The Autobiography of Malcolm X 108–125 (1964); H. Thoreau, Civil Disobedience 18–22 (1849, reprinted 1969); The Confessions of Saint Augustine 31, 36–37 (Franklin Library ed. 1980). *Amicus* Association of American Publishers, Inc., has submitted a sobering bibliography listing hundreds of works by American prisoners and ex-prisoners, many of which contain descriptions of the crimes for which the authors were incar-

cerated, including works by such authors as Emma Goldman and Martin Luther King, Jr. A list of prominent figures whose autobiographies would be subject to the statute if written is not difficult to construct: The list could include Sir Walter Raleigh, who was convicted of treason after a dubiously conducted 1603 trial; Jesse Jackson, who was arrested in 1963 for trespass and resisting arrest after attempting to be served at a lunch counter in North Carolina; and Bertrand Russell, who was jailed for seven days at the age of 89 for participating in a sit-down protest against nuclear weapons. The argument that a statute like the Son of Sam law would prevent publication of *all* of these works is hyperbole—some would have been written without compensation—but the Son of Sam law clearly reaches a wide range of literature that does not enable a criminal to profit from his crime while a victim remains uncompensated.*

---

*Because the Son of Sam law is so overinclusive, we need not address the Board's contention that the statute is content neutral under our decisions in *Ward* v. *Rock Against Racism*, 491 U. S. 781 (1989), and *Renton* v. *Playtime Theatres, Inc.*, 475 U. S. 41 (1986). In these cases, we determined that statutes were content neutral where they were intended to serve purposes unrelated to the content of the regulated speech, despite their incidental effects on some speakers but not others. Even under *Ward* and *Renton*, however, regulations must be "narrowly tailored" to advance the interest asserted by the State. *Ward, supra,* at 798; *Renton, supra,* at 52. A regulation is not "narrowly tailored"—even under the more lenient tailoring standards applied in *Ward* and *Renton*—where, as here, "a substantial portion of the burden on speech does not serve to advance [the State's content-neutral] goals." *Ward, supra,* at 799. Thus whether the Son of Sam law is analyzed as content neutral under *Ward* or content based under *Leathers*, it is too overinclusive to satisfy the requirements of the First Amendment. And, in light of our conclusion in this case, we need not decide whether, as JUSTICE BLACKMUN suggests, the Son of Sam law is underinclusive as well as overinclusive. Nor does this case present a need to address JUSTICE KENNEDY's discussion of what is a longstanding debate, see G. Gunther, Constitutional Law 1069–1070 (12th ed. 1991), on an issue which the parties before us have neither briefed nor argued.

Should a prominent figure write his autobiography at the end of his career, and include in an early chapter a brief recollection of having stolen (in New York) a nearly worthless item as a youthful prank, the Board would control his entire income from the book for five years, and would make that income available to all of the author's creditors, despite the fact that the statute of limitations for this minor incident had long since run. That the Son of Sam law can produce such an outcome indicates that the statute is, to say the least, not narrowly tailored to achieve the State's objective of compensating crime victims from the profits of crime.

## III

The Federal Government and many of the States have enacted statutes designed to serve purposes similar to that served by the Son of Sam law. Some of these statutes may be quite different from New York's, and we have no occasion to determine the constitutionality of these other laws. We conclude simply that in the Son of Sam law, New York has singled out speech on a particular subject for a financial burden that it places on no other speech and no other income. The State's interest in compensating victims from the fruits of crime is a compelling one, but the Son of Sam law is not narrowly tailored to advance that objective. As a result, the statute is inconsistent with the First Amendment.

The judgment of the Court of Appeals is accordingly

*Reversed.*

JUSTICE THOMAS took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, concurring in the judgment.

I am in general agreement with what the Court says in its opinion. I think, however, that the New York statute is underinclusive as well as overinclusive and that we should

say so. Most other States have similar legislation and deserve from this Court all the guidance it can render in this very sensitive area.

JUSTICE KENNEDY, concurring in the judgment.

The New York statute we now consider imposes severe restrictions on authors and publishers, using as its sole criterion the content of what is written. The regulated content has the full protection of the First Amendment and this, I submit, is itself a full and sufficient reason for holding the statute unconstitutional. In my view it is both unnecessary and incorrect to ask whether the State can show that the statute " 'is necessary to serve a compelling state interest and is narrowly drawn to achieve that end.' " *Ante,* at 118 (quoting *Arkansas Writers' Project, Inc.* v. *Ragland,* 481 U. S. 221, 231 (1987)). That test or formulation derives from our equal protection jurisprudence, see, *e. g., Wygant* v. *Jackson Board of Ed.,* 476 U. S. 267, 273–274 (1986) (opinion of Powell, J.); *Hirabayashi* v. *United States,* 320 U. S. 81, 100 (1943), and has no real or legitimate place when the Court considers the straightforward question whether the State may enact a burdensome restriction of speech based on content only, apart from any considerations of time, place, and manner or the use of public forums.

Here, a law is directed to speech alone where the speech in question is not obscene, not defamatory, not words tantamount to an act otherwise criminal, not an impairment of some other constitutional right, not an incitement to lawless action, and not calculated or likely to bring about imminent harm the State has the substantive power to prevent. No further inquiry is necessary to reject the State's argument that the statute should be upheld.

Borrowing the compelling interest and narrow tailoring analysis is ill advised when all that is at issue is a content-based restriction, for resort to the test might be read as a

concession that States may censor speech whenever they believe there is a compelling justification for doing so. Our precedents and traditions allow no such inference.

This said, it must be acknowledged that the compelling interest inquiry has found its way into our First Amendment jurisprudence of late, even where the sole question is, or ought to be, whether the restriction is in fact content based. Although the notion that protected speech may be restricted on the basis of content if the restriction survives what has sometimes been termed "'the most exacting scrutiny,'" *Texas* v. *Johnson*, 491 U. S. 397, 412 (1989), may seem familiar, the Court appears to have adopted this formulation in First Amendment cases by accident rather than as the result of a considered judgment. In *Johnson*, for example, we cited *Boos* v. *Barry*, 485 U. S. 312, 321 (1988), as support for the approach. *Boos* v. *Barry* in turn cited *Perry Ed. Assn.* v. *Perry Local Educators' Assn.*, 460 U. S. 37, 45 (1983), for the proposition that to justify a content-based restriction on political speech in a public forum, the State must show that "the 'regulation is necessary to serve a compelling state interest and that it is narrowly drawn to achieve that end.'" *Boos* v. *Barry, supra,* at 321. Turning to the appropriate page in *Perry,* we discover that the statement was supported with a citation of *Carey* v. *Brown,* 447 U. S. 455, 461 (1980). Looking at last to *Carey,* it turns out the Court was making a statement about equal protection: "When government regulation discriminates among speech-related activities in a public forum, the Equal Protection Clause mandates that the legislation be finely tailored to serve substantial state interests, and the justifications offered for any distinctions it draws must be carefully scrutinized." *Id.,* at 461–462. Thus was a principle of equal protection transformed into one about the government's power to regulate the content of speech in a public forum, and from this to a more general First Amendment statement about the government's power to regulate the content of speech.

The employment of the compelling interest test in the present context is in no way justified by my colleagues' citation of *Arkansas Writers' Project* v. *Ragland*. *Ante*, at 118. True, both *Ragland* and the case on which it relied, *Minneapolis Star & Tribune Co.* v. *Minnesota Comm'r of Revenue*, 460 U. S. 575 (1983), recite either the compelling interest test or a close variant, see *Ragland, supra*, at 231; *Minneapolis Star, supra*, at 585, but neither is a case in which the State regulates speech for its content.

There are, of course, other cases, some even predating the slow metamorphosis of *Carey* v. *Brown's* equal protection analysis into First Amendment law, which apply the compelling interest test, but these authorities also address issues other than content censorship. See *Buckley* v. *Valeo*, 424 U. S. 1, 25 (1976) (upholding content-neutral limitations on financial contributions to campaigns for federal office and striking down content-neutral limitations on financial expenditures for such campaigns); *Cousins* v. *Wigoda*, 419 U. S. 477, 489 (1975) (content-neutral restriction on freedom of association); *NAACP* v. *Button*, 371 U. S. 415, 438 (1963) (content-neutral prohibition on solicitation by lawyers); *Shelton* v. *Tucker*, 364 U. S. 479, 488 (1960) (content-neutral statute compelling teachers in state-supported schools or colleges to disclose all organizations to which they belonged or contributed).

The inapplicability of the compelling interest test to content-based restrictions on speech is demonstrated by our repeated statement that "above all else, the First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Police Dept. of Chicago* v. *Mosley*, 408 U. S. 92, 95 (1972). See also *Ragland*, 481 U. S., at 229–230 (citing *Mosley*); *Regan* v. *Time, Inc.*, 468 U. S. 641, 648–649 (1984) ("Regulations which permit the Government to discriminate on the basis of the content of the message cannot be tolerated under the First Amendment"). These

general statements about the government's lack of power to engage in content discrimination reflect a surer basis for protecting speech than does the test used by the Court today.

There are a few legal categories in which content-based regulation has been permitted or at least contemplated. These include obscenity, see, *e. g.*, *Miller* v. *California*, 413 U. S. 15 (1973), defamation, see, *e. g.*, *Dun & Bradstreet, Inc.* v. *Greenmoss Builders, Inc.*, 472 U. S. 749 (1985), incitement, see, *e. g.*, *Brandenburg* v. *Ohio*, 395 U. S. 444 (1969), or situations presenting some grave and imminent danger the government has the power to prevent, see, *e. g.*, *Near* v. *Minnesota ex rel. Olson*, 283 U. S. 697, 716 (1931). These are, however, historic and traditional categories long familiar to the bar, although with respect to the last category it is most difficult for the government to prevail. See *New York Times Co.* v. *United States*, 403 U. S. 713 (1971). While it cannot be said with certainty that the foregoing types of expression are or will remain the only ones that are without First Amendment protection, as evidenced by the proscription of some visual depictions of sexual conduct by children, see *New York* v. *Ferber*, 458 U. S. 747 (1982), the use of these traditional legal categories is preferable to the sort of ad hoc balancing that the Court henceforth must perform in every case if the analysis here used becomes our standard test.

As a practical matter, perhaps we will interpret the compelling interest test in cases involving content regulation so that the results become parallel to the historic categories I have discussed, although an enterprise such as today's tends not to remain *pro forma* but to take on a life of its own. When we leave open the possibility that various sorts of content regulations are appropriate, we discount the value of our precedents and invite experiments that in fact present clear violations of the First Amendment, as is true in the case before us.

To forgo the compelling interest test in cases involving direct content-based burdens on speech would not, of course,

eliminate the need for difficult judgments respecting First Amendment issues. Among the questions we cannot avoid the necessity of deciding are: Whether the restricted expression falls within one of the unprotected categories discussed above, *supra,* at 127; whether some other constitutional right is impaired, see *Nebraska Press Assn.* v. *Stuart,* 427 U. S. 539 (1976); whether, in the case of a regulation of activity which combines expressive with nonexpressive elements, the regulation aims at the activity or the expression, compare *United States* v. *O'Brien,* 391 U. S. 367 (1968), with *Texas* v. *Johnson,* 491 U. S., at 406–410; whether the regulation restricts speech itself or only the time, place, or manner of speech, see *Ward* v. *Rock Against Racism,* 491 U. S. 781 (1989); and whether the regulation is in fact content based or content neutral. See *Boos* v. *Barry,* 485 U. S., at 319–321. However difficult the lines may be to draw in some cases, here the answer to each of these questions is clear.

The case before us presents the opportunity to adhere to a surer test for content-based cases and to avoid using an unnecessary formulation, one with the capacity to weaken central protections of the First Amendment. I would recognize this opportunity to confirm our past holdings and to rule that the New York statute amounts to raw censorship based on content, censorship forbidden by the text of the First Amendment and well-settled principles protecting speech and the press. That ought to end the matter.

With these observations, I concur in the judgment of the Court holding the statute invalid.