FIFTH DIVISION
December 21, 2007

No. 1-05-2924

| | |
|---|---|
| POOH-BAH ENTERPRISES, INC., d/b/a Crazy Horse Too, | ) |
| | ) Appeal from the |
| | ) Circuit Court of |
| Plaintiff-Appellant, | ) Cook County |
| | ) |
| v. | ) |
| | ) |
| THE COUNTY OF COOK; BARBARA BRUNO, | ) |
| Director of the Cook County Department of Revenue; and | ) Honorable |
| THE CITY OF CHICAGO, | ) Alexander P. White, |
| | ) Judge Presiding. |
| Defendants-Appellees. | ) |

JUSTICE O'MARA FROSSARD delivered the opinion of the court:

Plaintiff Pooh-Bah Enterprises, Inc., appeals the orders that granted the motions to dismiss

filed by defendants the County of Cook and the director of its department of revenue (the

County), and the City of Chicago (the City). Plaintiff's dismissed action sought declaratory and

injunctive relief against defendants, challenging the constitutionality of their amusement tax

exemptions for small, fine arts venues that exclude adult entertainment cabarets. On appeal,

plaintiff contends that the tax exemption scheme: (1) violates the first amendment of the United

States Constitution; (2) violates the free speech clause of the Illinois Constitution; (3) is

overbroad; (4) is vague; and (5) violates the uniformity clause of the Illinois Constitution. For the

reasons that follow, we reverse the judgment of the circuit court.

1-05-2924

BACKGROUND

The City imposes on patrons of any amusement a tax of 8% on the admission price to enter, witness, view, or participate in any amusement within its boundaries. Chicago Municipal Code §4-156-020(A) (amended December 15, 2004). The County imposes a virtually identical tax at a rate of 3%. Cook County Amusement Tax Ordinance, §3 (eff. April 1, 1999).

The City defines *amusement* as:

> "any exhibition, performance, presentation or show for entertainment purposes, *** including, but not limited to, any theatrical, dramatic, musical or spectacular performance, promotional show, motion picture show, flower, poultry or animal show, animal act, circus, rodeo, athletic contest, sport, game or similar exhibition [or] *** any paid television programming." Chicago Municipal Code §4-156-010 (2006).

The County's definition of *amusement* is similar. Cook County Amusement Tax Ordinance, §2 (eff. April 1, 1999).

Effective January 1999, the City and County amended their amusement tax ordinances, with the intent to foster the production of live performances that offer theatrical, musical or cultural enrichment. See City Council Journal Entry, November 12, 1998, amending §4-156-020(D); Cook County Board of Commissioner's Resolution, November 17, 1998, amending the amusement tax ordinance. Specifically, the City and County exempted from the amusement tax live theatrical, live musical or other live cultural performances that take place in a space with a maximum capacity of not more than 750 people (hereinafter, the small-venue exemption).

2

Chicago Municipal Code §4-156-020(D)(1) (2006); Cook County Amusement Tax Ordinance, §3D(1) (eff. April 1, 1999). To clarify the exemption, amendments were passed in April 1999 defining *live theatrical, live musical or other live cultural performance* as:

"a live performance in any of the disciplines which are commonly regarded as part of the fine arts, such as live theater, music, opera, drama, comedy, ballet, modern or traditional dance, and book or poetry readings. The term does not include such amusements as athletic events, races or performances conducted at adult entertainment cabarets [as defined by local ordinance]." Chicago Municipal Code §4-156-010 (amended April 21, 1999); Cook County Amusement Tax Ordinance, §2 (eff. April 1, 1999).

The following definitions are contained in section 16-16-030 of the City's adult use ordinance:

" 'Adult entertainment cabaret' means a public or private establishment which: (i) features topless dancers, strippers, male or female impersonators; (ii) not infrequently, features entertainers who display 'specified anatomical areas'; or (iii) features entertainers who by reason of their appearance or conduct perform in a manner which is designed primarily to appeal to the prurient interest of the patron or entertainers who engage in, or engage in the explicit simulation of, 'specified sexual activities.'

'Specified sexual activities' means and is defined as:

1. Human genitals in a state of sexual stimulation or arousal;

2. Acts of human masturbation, sexual intercourse or sodomy;

3. Fondling or other erotic touching of human genitals, public region, buttock or female breast.

'Specified anatomical areas' means and is defined as:

1. Less than completely and opaquely covered: (a) human genitals, pubic region, (b) buttock and (c) female breast below a point immediately above the top of the areola; and

2. Human male genitals in a discernibly turgid state, even if completely and opaquely covered." Chicago Municipal Code §16-16-030 (2006).

Similar definitions of these same three terms are contained in the County's zoning ordinance. Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).

In 2001, plaintiff filed this action for declaratory and injunctive relief against the County. Plaintiff operates an adult entertainment cabaret in Chicago under the name Crazy Horse Too, which has a maximum capacity of less than 750 persons. Crazy Horse Too features live performances of exotic dancing by scantily clad women, who, during their dances, become semi-clothed in that they remove much of their clothing and display certain specified anatomical areas. Plaintiff's complaint challenged the provision of the small-venue exemption that excludes performances conducted at adult entertainment cabarets. Plaintiff argued the exclusion violates the first amendment of the United States Constitution and the free speech clause of the Illinois Constitution. The City filed a motion to intervene as a party defendant because its amusement tax and small-venue exemption are similar to the County's. The circuit court granted the motion.

1-05-2924

Plaintiff filed a second amended complaint, adding first amendment and free speech clause claims against the City. According to the complaint, after the small-venue exemptions were enacted, plaintiff stopped adding the amusement tax to the admission fee it charged and began paying the tax itself under protest. Plaintiff sought a refund of those taxes, arguing that the small-venue exemptions' exclusion of patrons of performances conducted at adult entertainment cabarets impermissibly discriminated on the basis of content, facially and as applied, against exotic dancing and other performances with adult content in violation of the first amendment and the free speech clause. Plaintiff also argued that the adult entertainment cabaret exclusions were, facially and as applied, overbroad and vague in violation of the first amendment and free speech clause.

The City and County moved to dismiss plaintiff's claims under section 2-615 of the Code of Civil Procedure (735 ILCS 5/2-615 (West 2002)), for failure to state a claim upon which relief may be granted. The circuit court granted the motions to dismiss, concluding that the exclusion of adult entertainment cabarets from the small-venue exemptions did not violate the first amendment, that the free speech clause of the Illinois Constitution did not provide any greater protection in this type of case, and that the tax exemption schemes were neither overbroad nor vague. Plaintiff filed a motion to reconsider, which was denied by the circuit court.

Plaintiff also filed a third amended complaint, containing two claims under the uniformity clause of the Illinois Constitution. The City then moved to dismiss, and the County joined the motion. The circuit court dismissed the new claims because it found that real and substantial differences existed between small, fine arts venues and adult entertainment cabarets, that similar

5

distinctions for tax purposes have been upheld, and that the differences bore a reasonable relationship to the small-venue exemption's purpose of enhancing the City's and County's reputations in the fine arts.

Plaintiff then appealed.

ANALYSIS

The circuit court granted defendants' motions to dismiss because plaintiff failed to state a claim upon which relief may be granted. In ruling on such a motion, the court considers all well-pleaded facts and reasonable inferences in the light most favorable to the plaintiff. Jackim v. CC-Lake, Inc., 363 Ill. App. 3d 759, 760-61 (2005). The only question presented by a section 2-615 motion to dismiss for failure to state a cause of action is whether sufficient facts are stated in the complaint which, if true, could entitle the plaintiff to relief. Illinois Graphics Co. v. Nickum, 159 Ill. 2d 469, 488 (1994). Our review of a dismissal under section 2-615 is *de novo*. Jackim, 363 Ill. App. 3d at 760.

First Amendment

The first amendment to the United States Constitution, made applicable to the states through the due process clause of the Fourteenth Amendment, prohibits governmental action that abridges freedom of speech. U.S. Const., amends. I, XIV; People v. Alexander, 204 Ill. 2d 472, 476 (2003). First amendment protections are not limited to the written or spoken word, but may also extend to expressive conduct. Texas v. Johnson, 491 U.S. 397, 404, 105 L. Ed. 2d 342, 353, 109 S. Ct. 2533, 2539 (1989). While erotic dancing of the sort practiced at Crazy Horse Too enjoys constitutional protection as expressive conduct, it falls "only within the outer ambit of the

1-05-2924

First Amendment's protection." City of Erie v. Pap's A.M., 529 U.S. 277, 289, 146 L. Ed. 2d 265, 278, 120 S. Ct. 1382, 1391 (2000).

Plaintiff raises both facial and as-applied constitutional challenges to the provisions in defendants' tax schemes that exclude adult entertainment cabarets from the amusement tax small-venue exemption. Plaintiff argues that the provisions are content-based on their face and the exclusion of performances conducted at adult entertainment cabarets applies to plaintiff's small venue by reference to the expressive activity performed inside. A party raising a facial challenge to a law bears the heavy burden of demonstrating that it is unconstitutional under any set of circumstances, whereas a party raising an as-applied challenge need only show that, although the law may be constitutionally applied in most circumstances, it was specifically applied to him in an unconstitutional manner. People v. Garvin, 219 Ill. 2d 104, 117 (2006).

"It is settled that speech can be effectively limited by the exercise of the taxing power." Speiser v. Randall, 357 U.S. 513, 518, 2 L. Ed. 2d 1460, 1468, 78 S. Ct. 1332, 1338 (1958), citing Grosjean v. American Press Co., 297 U.S. 233, 80 L. Ed. 660, 56 S. Ct. 444 (1936). Although it is constitutional to tax first amendment activities in a genuinely nondiscriminatory fashion (Arkansas Writers' Project, Inc. v. Ragland, 481 U.S. 221, 229, 95 L. Ed. 2d 209, 219, 107 S. Ct. 1722, 1727 (1987)), the Supreme Court in Leathers v. Medlock, 499 U.S. 439, 113 L. Ed. 2d 494, 111 S. Ct. 1438 (1991), identified three situations where a tax imposed by government will trigger strict scrutiny under the first amendment. Absent a compelling justification, the government may not exercise its taxing power to (1) single out the press, (2) target a small group of speakers, or (3) discriminate on the basis of the content of taxpayer

7

speech. <u>Leathers</u>, 499 U.S. at 447, 113 L. Ed. 2d at 503-04, 111 S. Ct. at 1443-44. Strict scrutiny requires the government to show that the law is both necessary to serve a compelling interest and narrowly tailored to achieve that end. <u>United States v. Playboy Entertainment Group. Inc.</u>, 529 U.S. 803, 813, 146 L. Ed. 2d 865, 879, 120 S. Ct. 1878, 1886 (2000).

In explaining the problematic nature of differential taxation, the Supreme Court, in the context of a discriminatory tax on a certain segment of print media, stated that the general applicability of any burdensome tax helps to ensure that it will be met with widespread opposition. But when such a law applies only to a single constituency, it is insulated from political constraint. <u>Minneapolis Star & Tribune Co. v. Minnesota Commissioner of Revenue</u>, 460 U.S. 575, 585, 75 L. Ed. 2d 295, 304-05, 103 S. Ct. 1365, 1371-72 (1983). Speaker-based or content-based taxes, absent a compelling government interest, will be struck down as a form of censorship. <u>Murdock v. Commonwealth of Pennsylvania</u>, 319 U.S. 105, 116, 87 L. Ed. 1292, 1300, 63 S. Ct. 870, 876 (1943) ("a community may not suppress, or the state tax, the dissemination of views because they are unpopular, annoying or distasteful"); <u>Grosjean</u>, 297 U.S. at 244, 80 L. Ed. at 666, 56 S. Ct. at 447 (a gross receipts tax derived from advertisements carried in newspapers operated as a restraint on speech).

The Supreme Court has also recognized that content-based tax *exemptions* operate to suppress speech and implicate strict scrutiny. In <u>Speiser</u>, 357 U.S. at 518, 2 L. Ed. 2d at 1468, 78 S. Ct. at 1338, where the Court deemed unconstitutional a California tax provision requiring veterans to sign a loyalty oath in order to claim a property tax exemption, the Court noted, "[i]t cannot be gainsaid that a discriminatory denial of a tax exemption for engaging in speech is a

limitation on free speech." Similarly, Illinois courts have recognized the suppressive nature of selective taxes and selective tax exemptions, holding that they are limited by the first amendment. American Multi-Cinema, Inc. v. City of Warrenville, 321 Ill. App. 3d 349, 354 (2001) (noting that a selective amusement tax on free speech will trigger heightened scrutiny under the first amendment if it discriminates on the basis of content); Satellink of Chicago, Inc. v. City of Chicago, 168 Ill. App. 3d 689, 696 (1988) (amusement tax amendment that targeted subscription television by exempting cable television would not withstand strict scrutiny analysis).

The City's and County's amusement taxes are taxes of general applicability, which apply to sports, theaters, movies, paid television, circuses, and numerous other forms of entertainment unless specifically exempted. The taxes do not single out the press for special treatment or target a small group of speakers. However, the third circumstance that triggers heightened scrutiny analysis under the first amendment–that the tax discriminates on the basis of the content of the speech–is an issue in this case.

Defendants argue that their amusement tax schemes should be deemed content-neutral because they were not enacted with the purpose of discriminating against any particular expression. According to defendants, the adult entertainment cabaret exclusions were not enacted to suppress protected expression but, rather, because that type of venue does not further the legitimate governmental policy of encouraging, through subsidization, small-venue fine arts performances that will enhance the City's and County's reputations in the fine arts. Because those policy interests are not related to the content of the message being expressed, defendants contend, their tax schemes should be considered content-neutral and, thus, strict scrutiny should not apply.

9

1-05-2924

We disagree.

## Content-Neutral and Content-Based Regulations

A regulation is content-neutral so long as it is " 'justified without reference to the content of the regulated speech.' " Ward v. Rock Against Racism, 491 U.S. 781, 791, 105 L. Ed. 2d 661, 675, 109 S. Ct. 2746, 2753 (1989), quoting Clark v. Community for Creative Non-Violence, 468 U.S. 288, 293, 82 L. Ed. 2d 221, 227, 104 S. Ct. 3065, 3069 (1984). Generally, laws that by their terms distinguish favored speech from disfavored speech on the basis of the ideas or views expressed are content-based. People v. Jones, 188 Ill. 2d 352, 358-60 (1999) (statute that banned the emission of loud amplified sound from vehicles but exempted advertising was content-based and violated the first amendment). Laws that confer benefits or impose burdens on speech without reference to the ideas or views expressed are in most instances content-neutral. Turner Broadcasting System, Inc. v. Federal Communications Comm'n, 512 U.S. 622, 643-44, 129 L. Ed. 2d 497, 518-19, 114 S. Ct. 2445, 2459-60 (1994) (strict scrutiny did not apply to requirement that cable systems must carry full power local broadcast stations because the provisions depended only on the operator's channel capacity, not the content of programming).

The first amendment does not generally countenance governmental control over the content of messages expressed by private individuals because each person should decide for himself or herself the ideas and beliefs deserving of expression, consideration, and adherence. Turner Broadcasting System, Inc., 512 U.S. at 641, 129 L. Ed. 2d at 517, 114 S. Ct. at 2458. Thus, content-based regulations are presumptively invalid (R.A.V. v. City of St. Paul, Minnesota, 505 U.S. 377, 382, 120 L. Ed. 2d 305, 317, 112 S. Ct. 2538, 2542 (1992)) and will be upheld

10

only if necessary to serve a compelling governmental interest and narrowly drawn to achieve that end (Widmar v. Vincent, 454 U.S. 263, 270, 70 L. Ed. 2d 440, 447-48, 102 S. Ct. 269, 274 (1981)).

Although the government's purpose is the controlling consideration in determining content neutrality, the mere assertion of a content-neutral purpose will not save a law "which, on its face, discriminates based on content." Turner Broadcasting System, Inc., 512 U.S. at 642-43, 129 L. Ed. 2d at 518, 114 S. Ct. at 2459. See also Jones, 188 Ill. 2d at 361-62. The fact that defendants' small-venue exemptions may have been intended to serve content-neutral goals is not dispositive. The Supreme Court has repeatedly stated that " '[i]llicit legislative intent is not the *sine qua non* of a violation of the First Amendment.' " Simon & Schuster, Inc. v. Members of the New York State Crime Victims Board, 502 U.S. 105, 117, 116 L. Ed. 2d 476, 488, 112 S. Ct. 501, 509 (1991), quoting Minneapolis Star & Tribune Co., 460 U.S. at 592, 75 L. Ed. 2d at 309, 103 S. Ct. at 1376. We therefore reject defendants' contention that the existence of a content-neutral purpose renders the tax ordinances at issue here content-neutral.

The language of the definitions from the City's adult use ordinance and the County's zoning ordinance, which were incorporated into the City's and County's respective small-venue exemptions, establishes that the adult entertainment cabaret exclusions, on their face, discriminate based on content. Specifically, the definitions in the amusement tax ordinances of *live theatrical, live musical or other live cultural performance* (Chicago Municipal Code §4-156-010 (2006); Cook County Amusement Tax Ordinance, §2 (eff. April 1,1999)) reference the definition of *adult entertainment cabaret* contained within the City's adult use ordinance or the County's zoning

11

ordinance (Chicago Municipal Code §16-16-030 (2005); Cook County Zoning Ordinance of 2001, Art. 14.2.1 (2006)).  Both the City's adult use ordinance and the County's zoning ordinance define an *adult entertainment cabaret* by the content of the expression featured at the establishment, *e.g.*, topless dancing, stripping, entertainers who display specified anatomical areas (excessive breast or buttocks skin exposure), etc.  Chicago Municipal Code §16-16-030 (2005); Cook County Zoning Ordinance of 2001, art. 14.2.1 (2006).  Consequently, read together, the operative language of those ordinances excludes from the amusement tax small-venue exemption those amusements that are defined, insofar as applied to plaintiff, by semi-naked erotic performance art or expression.  One cannot determine whether the operative criteria of the adult entertainment cabaret exclusions apply to a particular small venue without considering the content of the small venue's featured speech or expressive conduct.

Defendants are not aided by their citation to Leathers, where the Supreme Court found that an Arkansas statute extending the generally applicable sales tax to cable services (but not satellite services), while maintaining existing exemptions for magazines and newspapers, did not raise first amendment concerns.  Leathers, 499 U.S. at 453, 113 L. Ed. 2d at 508, 111 S. Ct. at 1447.  There, the Court determined that the Arkansas sales tax was not content-based because nothing in the statute referred to the content of mass media communications.  Moreover, cable television offered subscribers a mixture of news, information, and entertainment and there was no record evidence that such material differed systematically in its message from that communicated by satellite broadcast programming, newspapers, or magazines.  Leathers, 499 U.S. at 449, 113 L. Ed. 2d at 505, 111 S. Ct. at 1445.  Here, in contrast, defendants' adult entertainment cabaret

exclusions are content-based and the content of the performances featured at such cabarets differs systematically in its erotic message from that communicated by the exempt fine arts venues.

Compelling Interest

Accordingly, because the differential tax on erotic dance is a content-based regulation on protected expression, it is presumptively invalid and may be upheld only if it is necessary to serve a compelling state interest and narrowly drawn to achieve that end. Because defendants argued on appeal, unsuccessfully, that their tax schemes were content-neutral, they did not argue that their tax schemes served a compelling state interest in order to survive a first amendment strict scrutiny analysis.

Alternatively, defendants argue that their adult entertainment cabaret exclusions do not prohibit or restrict exotic dancing but, rather, are governmental policy to encourage, through subsidization, the production of innovative fine arts performances at small venues in an effort to enhance the City's and County's reputations in the fine arts. Defendants contend that new and innovative shows have a greater chance of being chosen for production on Broadway or to tour nationally. Moreover, such shows may have the added effect of drawing new restaurants, shops and hotels to the surrounding community. Defendants argue that the most efficient way to subsidize small, fine arts venues is to give their patrons an exemption from the amusement tax, because it relieves small venues of the administrative and financial burdens that flow from having to collect the tax from patrons and remit it to the City and County at specified times.

Defendants argue that state action that interferes is different from state action that encourages an alternative activity based on public policy. Citing Regan v. Taxation With

13

Representation of Washington, 461 U.S. 540, 76 L. Ed. 2d 129, 103 S. Ct. 1997 (1983), Rust v. Sullivan, 500 U.S. 173, 114 L. Ed. 2d 233, 111 S. Ct. 1759 (1991), and National Endowment for the Arts v. Finley, 524 U.S. 569, 141 L. Ed. 2d 500, 118 S. Ct. 2168 (1998), defendants argue that their tax schemes are consistent with Supreme Court rulings that allow the government to selectively fund a program to encourage certain activities it believes to be in the public interest without at the same time funding an alternative program. We disagree. Regan, Rust, and Finley do not establish that the government can encourage one private speaker over another based on content or message without implicating first amendment concerns.

Regan held that an internal revenue statute that prohibited tax exempt charitable organizations from using tax-deductible contributions to support their lobbying efforts did not violate the first amendment, which did not require Congress to subsidize lobbying. Regan, 461 U.S. at 546, 76 L. Ed. 2d at 137, 103 S. Ct. at 2001. Furthermore, the statute did not violate the equal protection component of the fifth amendment, because it was rational for Congress to decide that, even though it would not subsidize substantial lobbying by charities generally, it would subsidize lobbying by veterans' organizations given our country's long-standing policy of compensating veterans for their past contributions by providing them with numerous advantages. Regan, 461 U.S. at 550-51, 76 L. Ed. 2d at 140, 103 S. Ct. at 2003-04.

Unlike the tax ordinances before us, Congress in Regan did not discriminate invidiously in granting its exemptions, which were not aimed at suppressing any ideas. Veterans' organizations were entitled to receive tax-deductible contributions regardless of the content of any speech they might use, including lobbying. Congress could exempt veterans' organizations from taxation

14

differently than it did charitable organizations as long as the exemption was not content-based. Regan, 461 U.S. at 548, 76 L. Ed. 2d at 138, 103 S. Ct. at 2002. Regan did not uphold, or even address, discrimination between speech or expressive activities based on content.

In Rust, 500 U.S. at 178-80, 114 L. Ed. 2d at 246-47, 111 S. Ct. at 1764-66, regulations prohibited recipients of federal funds appropriated for family-planning services from engaging in counseling concerning, referrals for, and activities advocating abortion and required the recipients to maintain separate facilities, personnel and accounting records from any abortion activity. Those regulations did not violate first amendment free speech rights because the government did not discriminate on the basis of viewpoint. The government merely chose to fund one activity to the exclusion of another, and the regulations simply ensured that federal funds were not used for activities, including speech, that were outside the scope of the federal program. Rust, 500 U.S. at 193, 114 L. Ed. 2d at 255, 111 S. Ct. at 1772. In contrast to our case, Rust concerned the dissemination to the public of a specific government message through a focused government subsidy program that paid organizations to distribute the government's message. Rust did not involve encouraging selected private speech by private citizens exercising their first amendment rights. Rust, 500 U.S. at 199, 114 L. Ed. 2d at 259, 111 S. Ct. at 1775.

Defendants' reliance on Rust is misplaced because that case involved the government speech doctrine rather than government regulation of private speech. In accordance with the government speech doctrine, when the government itself is speaking or is paying a third party to speak to the public on the government's behalf, the government's message is not subject to first amendment restrictions. This doctrine follows from the simple fact that the first amendment aims

to protect citizens' free speech from government interference. Later, in Rosenberger v. Rector & Visitors of the University of Virginia, 515 U.S. 819, 132 L. Ed. 2d 700, 115 S. Ct. 2510 (1995), the Court reiterated the point that the constitutional regulation of speech discussed in Rust did not apply to a government-created program to encourage private speech, but was limited to situations where the government disbursed public finds to private speakers to transmit specific information pertaining to the government's own program. Rosenberger, 515 U.S. at 833, 132 L. Ed. 2d at 718, 115 S. Ct. at 2519 (where student organizations were subsidized by a state university but were not agents of the university, the student organizations' subsidized speech was private speech rather than government speech and, thus, not exempt from first amendment protection).

In Finley, 524 U.S. at 581-83, 141 L. Ed. 2d at 512-13, 118 S. Ct. at 2175-76, the Court upheld a grant program provision that implemented the consideration of decency and respect standards when determining which art projects would receive government subsidies. The provision was facially constitutional because it did not place conditions on grants or preclude awards to projects that might be deemed indecent or disrespectful. Finley, 524 U.S. at 581-83, 141 L. Ed. 2d at 512-13, 118 S. Ct. at 2175-77. Any content-based considerations taken into account in the grant-making process were a consequence of the nature of arts funding where the government agency's mandate was to make aesthetic judgments. Finley, 524 U.S. at 585-86, 141 L. Ed. 2d at 514-15, 118 S. Ct. at 2177-78. The Court, however, reiterated that if the provision was applied so as to discriminate based on " 'certain ideas or viewpoints' " (i.e., in a content-based manner) or if the decency or respect standards were an enforced requirement, the provision would then be subject to strict scrutiny review. Finley, 524 U.S. at 587, 141 L. Ed. 2d at 516, 118 S. Ct.

1-05-2924

at 2178-79, quoting Simon & Schuster, Inc., 502 U.S. at 116, 116 L. Ed. 2d at 487, 112 S. Ct. at 508. As discussed above, defendants' adult entertainment cabaret exclusions discriminate against protected speech based on content.

Regan, Rust, and Finley do not support defendants' contention that affirmative government policies encouraging selective private speech do not implicate the first amendment and thereby escape strict scrutiny analysis. Moreover, we find no compelling state interest which necessitates the content-based adult entertainment cabaret exclusions contained in defendants' amusement tax schemes. Defendants argue that they have a legitimate interest in enhancing Chicago's and Cook County's reputations in the fine arts. We do not disagree with this proposition; however, their interests do not rise to the level of a compelling state interest that will justify, under the first amendment, a content-based restriction on protected expression. See Minneapolis Star & Tribune Co., 460 U.S. at 586, 75 L. Ed. 2d at 305, 103 S. Ct. at 1372 (raising revenue is not a compelling interest sufficient to withstand strict scrutiny).

CONCLUSION

Accordingly, we hold that the City's and County's adult entertainment cabaret exclusions from the amusement tax small-venue exemptions are content-based regulations on speech that do not serve a compelling state interest and, therefore, violate the first amendment. Given this holding, we do not reach plaintiff's claims that the tax schemes are unconstitutionally overbroad or vague or violate the uniformity clause of the Illinois Constitution. We reverse the orders of the trial court that granted defendants' motions to dismiss for failure to state a claim and remand this cause for further proceedings.

Reversed and remanded.

FITZGERALD SMITH, P.J., and TULLY, J., concur.

17

1-05-2924