William GERBER, Plaintiff–Appellant,

v.

Rodney HICKMAN, Warden,
Defendant–Appellee.

No. 00–16494.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted March 20, 2002.

Filed May 23, 2002.

618

Teresa L. Zuber, Law Offices of Teresa L. Zuber, Sacramento, CA, for the plaintiff-appellant.

Gregory S. Walston, Deputy Attorney General, Sacramento, CA, for the defendant-appellee.

Before: SCHROEDER, Chief Judge, KOZINSKI, O'SCANNLAIN, RYMER, HAWKINS, TASHIMA, SILVERMAN, GOULD, PAEZ, BERZON, and RAWLINSON, Circuit Judges.

SILVERMAN, Circuit Judge.

William Gerber, an inmate in the California State prison system, filed an amended complaint in federal court in which he alleged: "Petitioner asserts that Mule Creek State Prison is violating his Constitutional Rights by not allowing him to provide his wife with a sperm specimen that she may use to be artificially inseminated." Gerber sought an order of the court directing the institution to permit him to provide "a sample of sperm to artificially inseminate his wife."

The district court dismissed Gerber's suit for failure to state a claim, ruling that a prisoner does not have a constitutional right to procreate while incarcerated. *Gerber v. Hickman*, 103 F.Supp.2d 1214, 1216–18 (E.D.Cal.2000). Because we agree with the district court that the right to procreate is fundamentally inconsistent with incarceration, we affirm.

## I. BACKGROUND

We adopt the statement of facts from the district court's thoughtful opinion:

Plaintiff, a forty-one year old man, is an inmate at Mule Creek State Prison serving a sentence of 100 years to life plus eleven years. Plaintiff's wife, Evelyn Gerber, is forty-four years old. Plaintiff and his wife want to have a baby. The California Department of Corrections ("CDC") prohibits family visits for inmates "sentenced to life without the possibility of parole [or] sentenced to life, without a parole date established by the Board of Prison Terms." Cal.Code Regs. tit. 15 § 3174(e)(2). No parole date has been set for plaintiff, and according to plaintiff, due to the length of his sentence, no parole date seems likely. Accordingly, he wishes to artificially inseminate his wife. To accomplish this, plaintiff requests that (1) a laboratory be permitted to mail him a plastic collection container at the prison along with a prepaid return mailer, (2) he be permitted to ejaculate into the container, and (3) the filled container be returned to the laboratory in the prepaid mailer by overnight mail. Alternatively, plaintiff requests that his counsel be permitted to personally pick up the container for transfer to the laboratory or health care provider. Plaintiff represents that he and his wife will bear all of the costs associated therewith, including any costs incurred by the CDC. Defendant [Hickman] refuses to accommodate plaintiff's request.

*Gerber,* 103 F.Supp.2d at 1216 (first alteration in original).

## II. JURISDICTION AND STANDARD OF REVIEW

We have jurisdiction over this appeal pursuant to 28 U.S.C. § 1291, and we review de novo a district court's dismissal for failure to state a claim. *Monterey Plaza Hotel, Ltd. v. Local 483,* 215 F.3d 923, 926 (9th Cir.2000).

## III. ANALYSIS

### A. Fundamental Rights in the Prison Setting

■ It is well-settled that "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Turner v. Safley,* 482 U.S. 78, 84, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). A state could not, for example, decide to ban inmate access to mail or prohibit access to the courts. However, "while persons imprisoned ... enjoy many protections of the Constitution, it is also clear that imprisonment carries with it the ... loss of many significant rights." *Hudson v. Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). The very fact of incarceration thus "withdraw[s] or limit[s] ... many privileges and rights," and this "retraction [is] justified by the considerations underlying our penal system." *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974) (internal quotation marks omitted). Prisoners retain only those rights "not inconsistent with [their] status as ... prisoner[s] or with the legitimate penological objectives of the corrections system." *Hudson,* 468 U.S. at 523, 104 S.Ct. 3194 (quoting *Pell,* 417 U.S. at 822, 94 S.Ct. 2800) (alterations in original).

Gerber challenges the prison's refusal to allow him to artificially inseminate his wife from prison. In order to determine whether this amounts to an impermissible deprivation of Gerber's constitutional rights, our inquiry is two-fold. First, we must determine whether the right to procreate while in prison is fundamentally inconsistent with incarceration. *Turner,* 482 U.S. at 94–96, 107 S.Ct. 2254. If so, this ends our inquiry. Prisoners cannot claim the protection of those rights fundamentally inconsistent with their status as prisoners.

Only if we determine that the asserted right is not inconsistent with incarceration do we proceed to the second question: Is the prison regulation abridging that right reasonably related to legitimate penological interests? *Turner,* 482 U.S. at 96–99, 107 S.Ct. 2254. If it is, the regulation is valid; if not, it is unconstitutional.

### B. Whether the Right to Procreate is Fundamentally Inconsistent with Incarceration

#### 1.

We begin our analysis by inquiring whether the right to procreate is fundamentally inconsistent with incarceration. Incarceration, by its very nature, removes an inmate from society. *Pell,* 417 U.S. at 822–23, 94 S.Ct. 2800. A necessary corollary to this removal is the separation of the prisoner from his spouse, his loved ones, his friends, family, and children. *Cf. Montanye v. Haymes,* 427 U.S. 236, 242 n. 4, 96 S.Ct. 2543, 49 L.Ed.2d 466 (1976) (noting that among the hardships that may result from a prison transfer are separation of the inmate from home and family). Once released from confinement, an inmate "can be gainfully employed and is free to be with family and friends and to form the other enduring attachments of normal life." *Morrissey v. Brewer,* 408 U.S. 471, 482, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972). But not until then.

■ During the period of confinement in prison, the right of intimate association, "a fundamental element of personal liberty," *Roberts v. United States Jaycees,* 468 U.S. 609, 618, 104 S.Ct. 3244, 82 L.Ed.2d 462 (1984), is necessarily abridged. Intimate association protects the kinds of relationships "that attend the creation and sustenance of a family—marriage, childbirth, the raising and education of children, and cohabitation with one's relatives...." *Id.* at 619, 104 S.Ct. 3244 (citations omitted). The loss of the right to intimate association is simply part and parcel of being imprisoned for conviction of a crime.

■ "[M]any aspects of marriage that make it a basic civil right, such as cohabitation, sexual intercourse, and the bearing and rearing of children, are superseded by the fact of confinement." *Goodwin v. Turner,* 702 F.Supp. 1452, 1454 (W.D.Mo. 1988). Thus, while the basic right to marry survives imprisonment, *Turner,* 482 U.S. at 96, 107 S.Ct. 2254, most of the attributes of marriage—cohabitation, physical intimacy, and bearing and raising children—do not. "Rights of marital privacy, like the right to marry and procreate, are necessarily and substantially abridged in a prison setting." *Hernandez v. Coughlin,* 18 F.3d 133, 137 (2d Cir.1994) (citing *Turner,* 482 U.S. at 95–96, 107 S.Ct. 2254). Incarceration is simply inconsistent with the vast majority of concomitants to marriage, privacy, and personal intimacy.

■ Our view is informed by "the legitimate policies and goals of the corrections system ...." *Pell,* 417 U.S. at 822, 94 S.Ct. 2800. We note that "confining criminal offenders in a facility where they are isolated from the rest of society" serves to deter crime and protect the public. *Id.* Also, "by quarantining criminal offenders

for a given period of time ... the rehabilitative processes of the corrections system work to correct the offender's demonstrated criminal proclivity." *Id.* at 823, 94 S.Ct. 2800. In this sense "[t]he curtailment of certain rights is necessary, as a practical matter, to accommodate a myriad of 'institutional needs and objectives' of prison facilities ...." *Hudson,* 468 U.S. at 524, 104 S.Ct. 3194 (quoting *Wolff v. McDonnell,* 418 U.S. 539, 555, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974)). Furthermore, "these restrictions or retractions also serve ... as reminders that, under our system of justice, deterrence and retribution are factors in addition to correction." *Hudson,* 468 U.S. at 524, 104 S.Ct. 3194. "[I]ncarceration, by its very nature, deprives a convicted individual of the fundamental right to be free from physical restraint," and this "in turn encompasses and restricts other fundamental rights, such as the right to procreate." *State v. Oakley,* 245 Wis.2d 447, 629 N.W.2d 200, 209 (2001) (citing *Meyer v. Nebraska,* 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923)).

■ For example, it is well-settled that prisoners have no constitutional right while incarcerated to contact visits or conjugal visits. See *Kentucky Dep't of Corrs. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (no due process right to unfettered visitation); *Block v. Rutherford,* 468 U.S. 576, 585–88, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (pretrial detainees have no constitutional due process right to contact visits); *Hernandez,* 18 F.3d at 137 (no constitutional right to conjugal visits); *Davis v. Carlson,* 837 F.2d 1318, 1319 (5th Cir.1988) (same); *Toussaint v. McCarthy,* 801 F.2d 1080, 1113–1114 (9th Cir.1986) (denial of contact visits does not violate Eighth Amendment).[1] The fact that California prison

---

1. *See also Barnett v. Centoni,* 31 F.3d 813, 817 (9th Cir.1994) (per curiam) (prisoner right to

officials may choose to permit some inmates the privilege of conjugal visits is simply irrelevant to whether there is a constitutional right to conjugal visits or a right to procreate while in prison.

■ It is difficult, if not impossible, to reconcile the holdings of cases like Turner, Hudson, and Pell and an understanding of the nature and goals of a prison system, with a wholly unprecedented reading of the constitution that would command the warden to accommodate Gerber's request to artificially inseminate his wife as a matter of right.

### 2.

■ One issue that arose during oral argument was the effect of technological advancement on the issue before us. If, for example, science progressed to the point where Gerber could artificially inseminate his wife as easily as write her a letter, would this change our analysis? It would not. Our conclusion that the right to procreate is inconsistent with incarceration is not dependent on the science of artificial insemination, or on how easy or difficult it is to accomplish. Rather, it is a conclusion that stems from consideration of the nature and goals of the correctional system, including isolating prisoners, deterring crime, punishing offenders, and providing rehabilitation. See generally Jack B. Weinstein & Catherine Wimberly, Secrecy in Law and Science, 23 Cardozo L.Rev. 1, 9–11 (2001) (discussing the interaction between law and science).

### 3.

Gerber argues that the right to be free from forced surgical sterilization, *Skinner v. Oklahoma*, 316 U.S. 535, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942), combined with the right to marry while in prison, *Turner*, 482 U.S. at 96, 107 S.Ct. 2254, inevitably leads to the conclusion that inmates have a constitutional right to procreate while in prison. This argument fails for two reasons.

■ First, Skinner stands only for the proposition that forced surgical sterilization of prisoners violates the Equal Protection Clause. The Court in Skinner recognized that procreation is fundamental to the existence of the race, and thus the state's "power to sterilize, if exercised, may have subtle, farreaching and devastating effects." *Skinner*, 316 U.S. at 541, 62 S.Ct. 1110. Sterilization is intrusive, permanent, and irreparable. By no stretch of the imagination, however, did Skinner hold that inmates have the right to exercise their ability to procreate while still in prison. The right to procreate while incarcerated and the right to be free from surgical sterilization by prison officials are two very different things. "There is simply no comparison between sterilization ... and denial of the facilitation of artificial insemination." *Goodwin*, 702 F.Supp. at 1454 (citation omitted). The Second Circuit in *Hernandez*, 18 F.3d at 136, has recognized this crucial distinction, noting in its discussion of Skinner that "inmates possess the right to maintain their procreative abilities for later use once released from custody ...." Later use, not current use.

access to counsel not inconsistent with lack of general right to contact visits); *Bellamy v. Bradley*, 729 F.2d 416, 420 (6th Cir.1984) (no absolute right to contact visits); *Montana v. Commissioners Court*, 659 F.2d 19, 21 (5th Cir.1981) (no constitutional right to conjugal visits); *Lynott v. Henderson*, 610 F.2d 340, 342 (5th Cir.1980) (no constitutional right to visitation); *Ramos v. Lamm*, 639 F.2d 559, 580 n. 26 (10th Cir.1980) (no constitutional right to contact visits); *McCray v. Sullivan*, 509 F.2d 1332, 1334–35 (5th Cir.1975) (no constitutional right to conjugal visits); *Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir.1975) (no constitutional right to physical contact with family); *Payne v. District of Columbia*, 253 F.2d 867, 868 (D.C.Cir.1958) (per curiam) (no right to conjugal visits in jail).

Second, the Supreme Court in Turner recognized that an inmate's right to marry while in prison did not include the inmate's right to consummate the marriage while in prison or to enjoy the other tangible aspects of marital intimacy. The Turner Court held that the right to marry and "many important attributes of marriage" survive incarceration, such as expressions of emotional support and the exercise of religious faith. 482 U.S. at 95–96, 107 S.Ct. 2254. However, the Court clearly stated that the right to marry "is subject to substantial restrictions as a result of incarceration," and that inmate marriages are formed "in the expectation that they ultimately will be fully consummated." *Id.* at 96, 107 S.Ct. 2254 (emphasis added). The Court plainly envisioned that while the intangible and emotional aspects of marriage survive incarceration, the physical aspects do not. See *Hernandez,* 18 F.3d at 137.

A holding that the State of California must accommodate Gerber's request to artificially inseminate his wife as a matter of constitutional right would be a radical and unprecedented interpretation of the Constitution. We hold that the right to procreate while in prison is fundamentally inconsistent with incarceration. Accordingly, we do not reach the second part of the analysis to inquire whether the prison's regulation is related to a valid penological interest.

## C. State Law Claims

Gerber alleges that the Hickman's failure to accommodate his artificial insemination request violates Cal.Penal Code §§ 2600 & 2601. Section 2600 provides that "persons sentenced to imprisonment in state prison may during that period of confinement be deprived of such rights ... reasonably related to legitimate penological interests." The test under

§ 2600 thus mirrors the *Turner v. Safley* inquiry. *Thompson v. Department of Corr.,* 25 Cal.4th 117, 130, 105 Cal.Rptr.2d 46, 18 P.3d 1198 (2001). We have already found that Gerber has no constitutional right to procreate while in prison. Nor can he show that the California constitution or California statutes afford him this right. The most Gerber can point to is the right to marry contained in § 2601 (permitting California prisoners to marry). Thus, Gerber cannot satisfy Thompson and fails to state a claim upon which relief can be granted. We therefore affirm the dismissal of his state law claims.

## D. Leave to Amend

Gerber argues that the district court abused its discretion in dismissing his complaint without leave to amend to add equal protection and Eighth Amendment claims. We review a denial of leave to amend for an abuse of discretion. *Simon v. Value Behavioral Health, Inc.,* 208 F.3d 1073, 1084 (9th Cir.2000).

Gerber claims that the state's refusal to allow him to provide his wife with a sperm sample violates equal protection principles, because the state allows conjugal visits to some inmates but denies them to him. However, Gerber is not similarly situated to inmates who are eligible for conjugal visits. Inmates eligible for conjugal visits will eventually be released from prison, Cal.Code Regs. tit. 15 § 3174(e)(2), while Gerber will not. We therefore apply rationality review. *Giannini v. Real,* 911 F.2d 354, 359 (9th Cir.1990). Because it is completely rational for prison officials to decide that maintaining contact with those outside the prison is more important for inmates who will eventually be released from prison than for those ineligible for parole, the distinction Gerber challenges is rational and his equal protection claim is without merit. Because leave to allege a

violation of the Equal Protection Clause would have been futile, the district did not abuse its discretion.

■ Gerber also argues that denial of his artificial insemination request violates the Eighth Amendment's prohibition against cruel and unusual punishment. Because the state's denial of his request to artificially inseminate his wife can by no means be considered a deprivation of "the minimal civilized measure of life's necessities," *Hudson v. McMillian,* 503 U.S. 1, 9, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992), granting leave for Gerber to allege an Eight Amendment claim would have been futile as well. The district court therefore acted within its discretion in dismissing Gerber's complaint without permitting leave to amend.

AFFIRMED.

TASHIMA, Circuit Judge, with whom KOZINSKI, HAWKINS, PAEZ, and BERZON, Circuit Judges, join, dissenting.

There is absolutely nothing in the record indicating that procreation *simpliciter*— the right to have a child—is fundamentally inconsistent with the fact of incarceration. The majority has cited no facts to support such a conclusion and common sense does not lead to such a result. I therefore respectfully dissent.

The majority assumes that there is a fundamental right to procreation and I agree. There can be no dispute that such a right exists. *See Carey v. Population Servs. Int'l,* 431 U.S. 678, 685, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) (citing the right of personal privacy in decisions relating to marriage, procreation, contraception, family relationships, and child rearing and education, and stating that "[t]he decision whether or not to beget or bear a child is at the very heart of this cluster of constitutionally protected choices"); *Skinner v. Oklahoma,* 316 U.S. 535, 541, 62 S.Ct. 1110, 86 L.Ed. 1655 (1942) (describing procreation as "one of the basic civil rights of man" and "fundamental to the very existence and survival of the race"). Thus, the question is whether that right is fundamentally inconsistent with incarceration. *See Hudson v. Palmer,* 468 U.S. 517, 523, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (stating that "we have insisted that prisoners be accorded those rights not fundamentally inconsistent with imprisonment itself or incompatible with the objectives of incarceration").

"It is settled that a prison inmate 'retains those [constitutional] rights that are not inconsistent with his status as a prisoner or with the legitimate penological objectives of the corrections system.'" *Turner v. Safley,* 482 U.S. 78, 95, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (quoting *Pell v. Procunier,* 417 U.S. 817, 822, 94 S.Ct. 2800, 41 L.Ed.2d 495 (1974)) (alteration in the original). However, relying "largely on the repetition of glittering generalities" about the nature of incarceration "that have little, if any, application" to the facts of this case, *Rice v. Cayetano,* 528 U.S. 495, 527, 120 S.Ct. 1044, 145 L.Ed.2d 1007 (2000) (Stevens, J., dissenting), the majority concludes that the right to procreate is inconsistent with incarceration. Of course, it is true that incarceration necessarily involves the curtailment of certain rights. The repetition of this vague principle in numerous ways, however, does not explain why the right to procreate is *fundamentally* inconsistent with incarceration, and the record before us offers no basis for that conclusion. We need not conclude at this stage of the litigation that the right to procreate necessarily *is* consistent with incarceration, but only that the record before us does not establish that it is *not.*

The rights cited by the majority that are inconsistent with incarceration—the right

to intimate association and the right to privacy—are clearly inconsistent with basic attributes of incarceration because of security concerns. Procreation through artificial insemination, however, implicates none of the restrictions on privacy and association that are necessary attributes of incarceration. Being separated from loved ones is certainly a necessary attribute of incarceration; because of the technology of artificial insemination, however, procreation can be achieved without compromising security. None of the rights that are necessarily curtailed by incarceration are at issue here.

The majority relies for its conclusion on *Turner, Hudson, Pell,* and "the nature and goals of a prison system." Maj. op. at 621–22. None of these, however, supports its position.

In *Turner,* the Supreme Court held that the fundamental right to marry survived incarceration, even though, "like many other rights, [it] is subject to substantial restrictions as a result of incarceration." 482 U.S. at 95–96, 107 S.Ct. 2254. The Court reasoned that "[m]any important attributes of marriage remain … after taking into account the limitations imposed by prison life," recounting elements of marriage that "are unaffected by the fact of confinement or the pursuit of legitimate corrections goals." *Id.* In holding that the right to marry survives incarceration, the Court therefore examined whether there were elements of the marriage relationship unaffected by incarceration "sufficient to form a constitutionally protected marital relationship in the prison context." *Id.* at 96, 107 S.Ct. 2254. Even though the Court noted that "most inmate marriages are formed in the expectation that they ultimately will be fully consummated," *id.,* this fact weighed in *favor* of finding that

the right to marry survived incarceration, not against it. It twists logic to construe this statement as meaning that prisons can prohibit prisoners from fathering children. It is merely a recognition of the understandable restrictions on freedom of association and privacy attendant with incarceration. This recognition does not support a conclusion that procreation is *fundamentally* inconsistent with incarceration.

*Hudson* merely holds that the Fourth Amendment proscription against unreasonable searches does not apply to prison cells, a reasonable conclusion in light of the difficult safety and security concerns inherent in a prison. 468 U.S. at 526–27, 104 S.Ct. 3194. By contrast, no such security concerns are implicated by Gerber's request. *Hudson*'s holding that inmates' privacy rights are abridged by the fact of incarceration does not support the conclusion that the fundamental right to procreate is similarly abridged. The majority has pointed to no facts to explain why the right to procreate should be treated in the same manner as the right to Fourth Amendment privacy.

*Pell* is also distinguishable. The issue in *Pell* was the constitutionality of a prison's prohibition on face-to-face interviews between inmates and the media. The Court emphasized that the prohibition involved "the entry of people into the prisons for face-to-face communication with inmates" in citing "security and related administrative problems" that justified the prohibition. 417 U.S. at 826, 94 S.Ct. 2800. Unlike *Pell,* Gerber's request does not involve the entry of people into the prison or any other circumstance that presents a security or administrative concern to make it per se inconsistent with incarceration.[1] In

---

1. *Pell* is also distinguishable because it relied on the fact that alternative "reasonable and

effective means of communication" remained open to prison inmates in finding the prohibi-

fact, the Warden has conceded that he could not prevent prisoners from sending samples of body fluids to a forensic laboratory in order to establish their innocence. Gerber's request involves essentially the same procedure; yet, the Warden has failed to explain why Gerber's request is distinguishable. There is no basis for the differing treatment of the two procedures.

The majority cites the "nature and goals of a prison system," but fails to identify even one way in which accommodating Gerber's request would be inconsistent with the legitimate needs of prison facilities. Maj. op. at 622. The majority identifies correctional goals such as isolating prisoners, deterring crime, punishing offenders, and providing rehabilitation that are supposedly inconsistent with the right to procreate, yet does not explain how the right is inconsistent with any of these goals. If, in fact, the purpose behind prohibiting procreation is to punish offenders, this is a determination that should be made by the legislature, not the Warden. *Cf. Turner*, 482 U.S. at 96, 107 S.Ct. 2254 (distinguishing its decision in *Butler v. Wilson*, 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), *summarily aff'g Johnson v. Rockefeller*, 365 F.Supp. 377 (S.D.N.Y.1973), on the basis that the prohibition on marriage in *Johnson* was "part of the punishment for [the] crime," determined by the legislature).

Here, it appears that the California Legislature has made no such determination. No state statute authorizes the Warden's prohibition. The only authority relied on

by the Warden to deny Gerber's request is a regulation of the Department of Corrections, Cal.Code Regs. tit. 15, § 3350(a), which provides that prison officials "shall only provide medical services for inmates which are based on medical necessity."[2] Cal.Code Regs. tit. 15, § 3350(a). Although the Warden's interpretation of the regulation is entitled to deference, *see People v. Goodloe*, 37 Cal.App.4th 485, 44 Cal. Rptr.2d 15, 20 (1995) (granting the Department of Corrections' interpretation of the Penal Code "great weight," unless clearly erroneous or unauthorized); *In re Semons*, 208 Cal.App.3d 1022, 256 Cal.Rptr. 641, 645 (1989) (applying same principle to the warden and the Department of Corrections' interpretation of a regulation), the regulation on its face does not authorize the Warden's position. Nor is there any state law supporting the Warden's interpretation of § 3350 as granting him authority to prohibit a prisoner from fathering a child. Section 3350 in no way addresses Gerber's request; it deals with the provision of medical care, and it is not medical care that Gerber seeks. The only request he has made is that prison authorities either mail the package containing the receptacle or permit his lawyer to retrieve it directly from him.

The majority emphasizes that, although California prison officials permit some inmates the privilege of conjugal visits, *see* Cal.Code Regs. tit. 15, § 3174, there is no right to such visits. It fails to recognize, however, that permitting conjugal visits gives rise to the strong possibility of pro-

---

tion constitutional. 417 U.S. at 826, 94 S.Ct. 2800. The fact that no alternative means of procreation are open to Gerber weighs against a finding that the prohibition is reasonably related to legitimate penological interests. *See Turner*, 482 U.S. at 90, 107 S.Ct. 2254.

**2.** At oral argument, counsel cited Cal.Code Regs. tit. 15, § 3354, which requires that "facility-employed health care staff" provide health care treatment for inmates. The Warden's brief, however, referred to § 3350, and his argument that he is required to provide only medically necessary treatment indicates that he probably means to rely on § 3350. Neither section supports his position.

creation resulting from these conjugal visits for hundreds, if not thousands, of inmates. Thus, permitting conjugal visits gives rise to the question of whether procreation truly is inconsistent with incarceration. If numerous other prisoners are permitted to procreate, how can procreation, per se, be fundamentally inconsistent with incarceration? [3]

The fact that prisoners have no constitutional right to contact visits or conjugal visits while incarcerated is irrelevant to the question of whether the concededly fundamental right to procreate is per se inconsistent with incarceration. The cases cited by the majority denying the right to conjugal visits, Maj. op. at 621–22 & n. 1, do not rely on the principle that such visits are fundamentally inconsistent with incarceration, but on other principles, such as the penological concerns that justify the restriction—an issue the majority does not reach. *See Hernandez v. Coughlin,* 18 F.3d 133, 137 (2d Cir.1994) (citing the "exigencies and operational considerations of our penal system" in finding no constitutionally protected right to conjugal visits); *Toussaint v. McCarthy,* 801 F.2d 1080, 1113–14 (9th Cir.1986) (holding that denial of contact visitation did not violate Eighth Amendment and reasoning that such denial is "based on sound penological justifications"); *see also Kentucky Dep't of Corr.,* 490 U.S. 454, 456–65, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989) (finding that prison regulations governing visitors did not create a liberty interest protected by the due process clause); *Block v. Rutherford,* 468 U.S. 576, 586, 104 S.Ct. 3227, 82 L.Ed.2d 438 (1984) (addressing the "narrow" question of "whether the prohibition of contact visits is reasonably related to legitimate governmental objectives"); *Barnett v. Cen-*

*toni,* 31 F.3d 813, 817(9th Cir.1994) (per curiam) (citing *Toussaint* to uphold dismissal of claim of right to contact visitation); *Davis v. Carlson,* 837 F.2d 1318, 1319 (5th Cir.1988) (per curiam) (stating without explanation that no constitutional right to conjugal visits exists, citing *McCray v. Sullivan,* 509 F.2d 1332 (5th Cir.1975)); *Bellamy v. Bradley,* 729 F.2d 416, 420 (6th Cir.1984) (stating that "[l]imitations upon visitation may be imposed if they are necessary to meet penological objectives such as the rehabilitation and the maintenance of security and order"); *Montana v. Comm'rs Court,* 659 F.2d 19, 21–22 (5th Cir. Unit A Sept.1981) (per curiam) (citing *McCray* to hold that there is no constitutional right to conjugal visits, and stating that contact visits may be denied for legitimate security reasons); *Ramos v. Lamm,* 639 F.2d 559, 580 n. 26 (10th Cir.1980) (stating only that "we think the weight of present authority clearly establishes that there is no constitutional right to contact visitation"); *Lynott v. Henderson,* 610 F.2d 340, 342 (5th Cr.1980) (although there is no constitutional right to visitation, limitations may be imposed "only if they are necessary to meet legitimate penological objectives"); *Oxendine v. Williams,* 509 F.2d 1405, 1407 (4th Cir.1975) (per curiam) (stating without explanation or citation that the prisoner "has no constitutional right to physical contact with his family"); *McCray,* 509 F.2d at 1334 (stating that conjugal visits are not a constitutional right because visitation privileges are "a matter subject to the discretion of prison officials"); *Payne v. Dist. of Columbia,* 253 F.2d 867, 868 (D.C.Cir.1958) (per curiam) (upholding without explanation the district court's dismissal for failure to state a claim a prison-

---

**3.** I emphasize, again, that Gerber is not seeking a conjugal visit. He seeks only to have the prison authorities either mail a package or allow his privately-retained attorney to retrieve it from him.

er's due process claim regarding conjugal visits). Not one of the cases cited by the majority addresses the question of whether a fundamental right, such as procreation, is per se inconsistent with incarceration. ·

Because the majority points to no facts in the record to support the conclusion that procreation is fundamentally inconsistent with incarceration, its position essentially rests on the "impression" that prisoners simply should not have the right to procreate by artificial insemination. *Goodwin v. Turner*, 702 F.Supp. 1452, 1454 (W.D.Mo.1988), *aff'd*, 908 F.2d 1395 (8th Cir.1990). However, "[n]either prisons nor courts should deny a reasonable request for the exercise of a constitutional right simply because it is novel." *Goodwin*, 908 F.2d at 1407 (McMillian, J., dissenting). The majority's vague references to penological needs fail to support the conclusion that the right to procreate is fundamentally inconsistent with incarceration.[4]

The majority relies on an extremely narrow reading of *Skinner*, limiting it to the proposition that forced surgical sterilization of prisoners violates the Equal Protection Clause, Maj. op. at 622–23, and ignoring the basis of that holding, which is the fundamental importance of the right to procreate. In fact, as in *Skinner*, the denial of Gerber's request does mean that Gerber "is forever deprived of a basic liberty," *Skinner*, 316 U.S. at 541, 62 S.Ct. 1110, and to deprive him of that basic liberty without so much as one fact to support the deprivation is an "exaggerated response" to vague penological objectives, *Turner*, 482 U.S. at 98, 107 S.Ct. 2254.

The majority relies on *Goodwin* to state that there is no comparison between sterilization and denial of the facilitation of artificial insemination. Maj. op. at 622.

That statement in *Goodwin*, however, was made in the context of the district court's reasoning that the denial would not permanently deprive the petitioner of the opportunity to father a child. *See Goodwin*, 702 F.Supp. at 1454 (distinguishing *Skinner* on the basis that it involved a permanent deprivation, "rather than a mere delay"). Unlike *Goodwin*, the deprivation in the instant case is permanent. Furthermore, in *Goodwin*, the petitioner was seeking "the facilitation of artificial insemination," in the sense that the prisoner was asking for the prison to provide him with a clean container and the means to transport the container. *Id.* By contrast, Gerber has made every arrangement to facilitate the process, having contacted the laboratory himself and asking the prison only to mail the package. Allowing this procedure would implicate no concerns different from allowing a prisoner to submit bodily fluids to a forensic laboratory to establish his innocence. The majority's "bald assertions of security interests will not justify the loss of a prisoner's fundamental rights." *Bradbury v. Wainwright*, 718 F.2d 1538, 1543 (11th Cir.1983).

After taking a narrow view of *Skinner*, the majority proceeds to take an extremely broad view of *Turner*, expanding the meaning of one sentence in *Turner* to justify its conclusion. As noted above, the Court's statement that inmate marriages are formed "in the expectation that they ultimately will be fully consummated," *Turner*, 482 U.S. at 96, 107 S.Ct. 2254, "[b]y no stretch of the imagination," Maj. op. at 623, is an expression of the Court's view that the fundamental right to procreate is per se inconsistent with incarceration. On the contrary, as the majority notes, this is merely a recognition that

---

4.  Indeed, it is difficult to square the Warden's allowance of private medical examinations at which blood, urine, and stool samples may be taken with the restriction at issue.

"the physical aspects" of marriage do not survive incarceration because of the limitations on privacy necessary to incarceration. Maj. op. at 623. Gerber's request does *not* involve "the physical aspects" of marriage. He asks only that prison officials either mail the package or allow his lawyer to retrieve it from him.

Vague incantations about the restrictions incarceration places upon privacy, intimate association, and the marriage relationship in general do not support such a broad prohibition on a right as fundamental as procreation. The majority has offered no explanation as to how Gerber's request in any way implicates the rights that are necessarily restricted by incarceration. The record before us does not offer any basis on which to conclude that Gerber's request is inconsistent with incarceration. What this case requires is a factual record from which it can be determined whether exercise of the right to procreation *simpliciter* is fundamentally inconsistent with incarceration and whether any penologically-justified reason exists to justify the Warden's denial of Gerber's request. For these reasons, I would vacate the district court's order dismissing the case for failure to state a claim and remand for further proceedings, including an evidentiary hearing to determine whether legitimate penological concerns justify this restriction. I therefore respectfully dissent.

KOZINSKI, Circuit Judge, with whom Judges PAEZ and BERZON join, dissenting:

The majority hinges its opinion on the proposition that "the right to procreate is fundamentally inconsistent with incarceration," Maj. Op. at 620, but does not explain how. Let's consider the possibilities. Gerber asks for permission to:

1. Ejaculate

2. into a plastic cup, which is then to be

3. mailed or given to his lawyer

4. for delivery to a laboratory

5. that will try to use its contents to artificially inseminate Mrs. Gerber.

I gather that the first step of this process is not fundamentally inconsistent with incarceration and prison guards don't patrol cell blocks at night looking for inmates committing Onan's transgression. Similarly, the prison has no penological interest in what prisoners do with their seed once it's spilt; a specimen cup would seem to be no worse a receptacle, from the prison's point of view, than any other.

Nor is there anything remotely inconsistent with incarceration in mailing a package, or handing it to your lawyer. Sure, the prison is entitled to make sure it doesn't contain prison escape plans, but Gerber is not claiming an exemption from routine security checks. That a package contains semen, rather than a book or an ashtray or some other such object, would seem to make no rational difference from the prison's point of view.

Once the package is outside prison walls, the prison's legitimate interest in it is greatly diminished. That it is to be delivered to a laboratory, rather than to any other willing recipient, seems to make no difference to prison authorities; certainly they have offered no proof that it does. Nor, I would think, does the prison have a legitimate interest in what the recipient does with the package. Whether it is used to inseminate Mrs. Gerber, to clone Gerber or as a paperweight has no conceivable effect on the safe and efficient operation of the California prison system.

Thus, what Gerber seeks to do is not inconsistent with incarceration the way it would be if he wanted to carry a Glock or conduct nuclear fission experiments in his cell. Production of the semen and delivery

to a laboratory neither compromises security, nor places a strain on prison resources beyond that required to mail any other package.

Perhaps the majority is talking about a different kind of inconsistency altogether. Prison is meant to deny inmates certain rights enjoyed by free people; loss of those rights is the punishment. It would be inconsistent with Gerber's status as an inmate for him to vacation in Paris or spend the weekend at home, because the very point of incarceration is to deny prisoners freedom of movement and the comforts of home. When the legislature imposes imprisonment as punishment for a crime, it necessarily curtails all those other rights that require freedom of physical movement for their exercise.

Is procreation one of those rights the exercise of which is inconsistent with the prisoner's loss of his freedom of locomotion? Apparently not, at least as Gerber proposes to exercise it. Gerber is not asking to go home for a conjugal visit, nor to enjoy such a visit within the prison; he does not seek to loosen the strictures of his confinement in the least. Gerber asks only to engage in activities that prisoners are already free to engage in (see steps 1–3 above). That these activities might result in the creation of a life outside prison walls is no more inconsistent with Gerber's status as a prisoner than is any other consequence of mailing materials from prison to the outside world. Thus, a prisoner might become a best-selling author by sending out a manuscript for a novel or biography. *See, e.g.,* O.J. Simpson, *I Want to Tell You* (1995); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.,* 502 U.S. 105, 112 S.Ct. 501, 116 L.Ed.2d 476 (1991). Or, he might be a graphic artist who sells his work by mail. *See* Michael Wayne Hunter, *Merchants of Death,* Orange Coast, Feb. 1995, at 80, 82–83, *available at* http://www.compusmart.ab.ca/deadmantalking/mhmerchant.htm (describing California death row prisoners who sell artwork). Or, as Judge Tashima points out, he might send out bodily fluids that result in proving his innocence. *See* Tashima Dissent at 625–26. These activities may give the prisoner great wealth and satisfaction, or may even result in his release from prison, but they are not inconsistent with his status as a prisoner because the physical acts required to accomplish them are entirely consistent with incarceration.

This would be a different case if the legislature of California had ordained that prisoners must lose the right to procreate as punishment for their crimes, in addition to loss of physical liberty. *See Turner v. Safley,* 482 U.S. 78, 96, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987) (distinguishing *Butler v. Wilson,* 415 U.S. 953, 94 S.Ct. 1479, 39 L.Ed.2d 569 (1974), in part because "importantly, denial of the right [to marry] was part of the punishment for crime"). But the legislature did no such thing. The statute pursuant to which Gerber was incarcerated merely provides for "imprisonment"; it says nothing about abrogating additional rights. *See* Cal.Penal Code § 667. When the California legislature wants to remove additional rights, such as the right to vote, it knows how to do so. *See* Cal. Elec.Code § 2212.

Nevertheless, could it be that, by ordering imprisonment, the legislature also *implicitly* cut off a prisoner's right to procreate? Even under the best of circumstances, this would be a difficult argument for the state to make, because the term "imprisonment" carries no plausible implication as to any rights other than those necessarily abridged by physical incarceration. Once we started walking down this road, where would we stop? Does the term "imprisonment" also im-

plicitly abridge the right to speak? Or the right to own property? The right to marry? To practice a religion? Absent some very compelling evidence of legislative intent, I am reluctant to conclude that, when the legislature uses a term meaning "defendant shall be locked up in a cell," it also implicitly cuts off other fundamental rights that can be exercised despite such incarceration.

But these are not the best of circumstances for the state to make this argument because we know for a fact that, by using the term "imprisonment," the legislature of California did *not* intend to cut off a prisoner's right to procreate. How do we know this? Because the California Department of Corrections, the agency charged by the legislature with administering the prison system, *see* Cal.Penal Code § 5054, has so interpreted the term "imprisonment." Title 15, section 3174 of the California Administrative Code provides that some prisoners (not including Gerber) are entitled to conjugal visits. Obviously, some of these visits will result in procreation. If "imprisonment" under California law abrogates the right to procreate, the Department of Corrections could not, by regulation, restore that right, just as it could not restore the right taken away by California Election Code § 2212 by setting up voting booths in the prison yard. By making arrangements for conjugal visits, the Department of Corrections must have concluded that imprisonment does *not* cut off a prisoner's right to procreate. We are required to defer to state agencies in their interpretation of the law they are charged with administering, *see Clallam County v. Dep't of Transp.,* 849 F.2d 424, 429 (9th Cir.1988), and so we must accept the Department of Corrections' entirely reasonable interpretation of the term "imprisonment," as not cutting off the right to procreate.

So we have no explicit, or even implicit, decision by the state legislature that imprisonment means loss of the right to procreate; there is no statute or regulation on point. And, as we have seen, there is also nothing inherently inconsistent about the mechanics of procreation—at least as Gerber proposes to practice them—that would compromise prison security, unduly burden prison resources or otherwise interfere with the safe and efficient operation of the California prison system.

What then is left? It is nothing more than the ad hoc decision of prison authorities that Gerber may not procreate. But, as the majority seems to admit, and as *Griswold v. Connecticut,* 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965), clearly holds, procreation (at least within the marital relationship) is a fundamental right. Such a right may be abrogated only pursuant to lawful authority and for compelling reasons. The reasons here must be particularly strong because the burden of this prohibition falls not only on Gerber but also on Mrs. Gerber, who is precluded from bearing a child fathered by her husband. As the Supreme Court noted in *Turner,* when a prison regulation creates a "consequential restriction on the [constitutional] rights of those who are *not* prisoners," it will be subjected to more searching scrutiny than when the burden falls only on inmates. *Turner,* 482 U.S. at 85, 107 S.Ct. 2254 (quoting *Procunier v. Martinez,* 416 U.S. 396, 409, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974), *overruled on other grounds by Thornburgh v. Abbott,* 490 U.S. 401, 413–14, 109 S.Ct. 1874, 104 L.Ed.2d 459 (1989)).

The majority suggests that abrogating the right to procreate serves the goals of "isolating prisoners, deterring crime, punishing offenders, and providing rehabilitation." Maj. Op. at 622; *id.* at 621 ("deterrence and retribution," quoting *Hudson v.*

**632**

*Palmer,* 468 U.S. 517, 524, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). But such judgments must be made by the legislature in setting the nature and degree of punishment for particular crimes. Prison administrators may not supplement the punishment imposed by the legislature because they believe doing so would enhance "deterrence and retribution." By cutting off Gerber's fundamental right to procreate, prison authorities have enhanced Gerber's punishment beyond that authorized by statute, and consigned Mrs. Gerber to a childless marriage. These are rights far too important to be abrogated based on nothing more than the personal opinion of prison bureaucrats that we would be better off as a society if the Gerbers were prevented from parenting an offspring. For these reasons, and those stated by Judge Tashima, I respectfully dissent.