Filed 9/29/16  In re A.C. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Butte)

----

| | |
|---|---|
| In re A.C., a Person Coming Under the Juvenile Court Law. | C077046 |
| BUTTE COUNTY DEPARTMENT OF EMPLOYMENT AND SOCIAL SERVICES, | (Super. Ct. No. J36897) |
| Plaintiff and Respondent, | |
| v. | |
| A.G., | |
| Defendant and Appellant. | |

Alicia G. (mother) appeals from the juvenile court's order granting de facto parent status to Valarie C., the maternal great-aunt of minor A.C.  (Welf. & Inst. Code, § 395, subd. (a)(1).)[1]  Mother challenges the constitutionality of allowing de facto parents to act as parties in juvenile dependency cases, calling it a violation of parents' due process rights under the federal and state Constitutions.  Mother also contends that the

---

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

appointment of Valarie C. as a de facto parent was an abuse of discretion. We shall affirm.

## I. BACKGROUND

On February 19, 2013, a section 300 petition was filed in Santa Clara County regarding the two-year-old minor. The petition alleged mother left the minor with roommates for over 10 days without provisions for the minor's care and supervision, and mother's and the alleged father's whereabouts were both unknown.

A report filed for the initial hearing stated that maternal great-aunt Kathi D. and her husband had taken custody of the minor in early February 2013 in Paradise (Butte County), California, from an adult female who said mother had left the minor with her in January 2013. Kathi D. said she could no longer care for the minor because of the minor's "disturbing behaviors," and because mother, a substance abuser with untreated mental health problems, had frequently called and threatened Kathi D.'s life.

The minor's father, Daniel C., was allegedly incarcerated for 10 years.[2]

Another maternal great-aunt, Valarie C., who lived in Paradise, California, had requested consideration for placement of the minor. Valarie C. stated that mother was estranged from her family, had older children who lived with their father in Concord, California, and had abandoned this minor multiple times.

A new section 300 petition, filed March 8, 2013, added the allegations that father was incarcerated and not eligible for parole until October 2016; mother had a criminal history and a substance abuse problem; and mother was arrested in February 2013 for possession of a controlled substance and battery. Further, it was found that mother and father had a history of severe domestic violence, to which the minor had been exposed.

---

[2] Daniel C. was declared the minor's presumed father, but voluntarily waived reunification services. He is not a party to this appeal.

On June 12, 2013, the juvenile court sustained the allegations of the section 300 petition as amended.

The jurisdiction/disposition report recommended granting reunification services as to mother, bypassing them as to father (§ 361.5, subds. (b)(12), (e)(1)), and transferring the case to Butte County, where mother lived.

Mother stated that she and the father of her older children were married, but had not lived together since 2007. In 2008, she became romantically involved with Daniel C., who had allegedly abused her physically and emotionally.

Mother was jailed on February 22, 2013, for battery and possession of a controlled substance. The charges remained pending.

Mother reported that she was a longtime abuser of alcohol, marijuana, and methamphetamine. She tested positive for amphetamine, marijuana, and methamphetamine on March 7, 2013. She had a history of high blood pressure and believed she also had hepatitis C.

Mother was removed from her own mother's care in early childhood and lived with her grandparents until age 14, when she moved in with her aunt and uncle in Paradise. She began therapy at age 11. She had been diagnosed with bipolar disorder. She became addicted to Lamictal after it was prescribed for her. In early 2013, when she stopped taking it, she began to have seizures, accompanied with hallucinations and blackouts, which continued to the present. She had also been prescribed Klonopin.

Mother believed she needed help and wanted to get sober and start services immediately. Her extended family was very supportive, although her substance abuse had alienated her from them.

Maternal great-aunt Valarie C. and maternal great-uncle Nick C. were being assessed for relative placement. They would be interested in legal guardianship if needed.

3

The minor was placed with Valarie C. and Nick C. on March 14, 2013. She had done well in their home physically, but seemed emotionally distressed. According to Valarie C., nighttime phone calls from mother had upset the minor so much that they had been stopped. The minor needed reassurance that the great-aunt and great-uncle would not abandon her. They were trying to establish a stable routine to help her feel safe.

Valarie C. and Nick C. reported ongoing difficulty with mother since they took the minor in. When mother visited, she would "bad mouth" other family members in front of the minor, even saying she wanted to "kill" certain family members because they had "kidnapped" the minor. Valarie C. suspected mother was using substances when she visited. Eventually, structured visits in the community were set up; so far, one such visit had occurred.

Valarie C. filed a police report on March 31, 2013, due to harassing phone calls from mother. The case worker reported that mother refused to take responsibility for her actions and blamed others for her current situation.

Mother claimed she had begun an outpatient substance abuse program, but the social worker had not been able to confirm this information. In text messages to Valarie C., mother admitted she was still using alcohol and Oxycontin.

The social worker felt mother needed strong boundaries, including an inpatient program and visits supervised by staff in a controlled setting.

Subsequent reports stated that mother intended to stay in Butte County. The minor was doing well in preschool, but remained anxious about abandonment and had begun therapy.

As of July 8, 2013, Valarie C. and Nick C. requested a change of placement for the minor because Valarie C.'s health was deteriorating. The minor would be moved to a foster family concurrent home in Chico while the social worker assessed other potential placements.

4

At the contested jurisdictional hearing on July 12, 2013, the Santa Clara County Juvenile Court found the allegations of the amended petition true. The court adjudged the minor a dependent child of the court, granted reunification services and supervised visitation to mother, and ordered mother to complete a residential drug treatment program and obtain a domestic violence victims support group.

On August 13, 2013, the Santa Clara County Juvenile Court ordered the case transferred out to Butte County.

On October 11, 2013, Butte County Department of Employment and Social Services, Children's Services Program (the Department) recommended acceptance of the transfer in. The minor was placed in a certified foster home in Chico and was being assessed by Butte County Behavioral Health.

Mother was currently homeless. She had done an alcohol and drug assessment (AOD). While awaiting admission to a residential treatment facility, she had been referred to outpatient substance abuse services and directed to attend daily community support group meetings. Mother reported struggles with depression and bipolar disorder. She had failed to appear for a random drug test, and her transient lifestyle made such testing difficult to conduct.

The disposition report, filed November 1, 2013, recommended continued out-of-home placement for the minor and reunification services for mother. Mother had regular supervised visits with the minor. The minor's unsupervised visits with Valarie C. and Nick C. had been placed on hold during the case transfer; since the transfer, there had been one further such visit.

At the disposition hearing on December 12, 2013, the juvenile court adopted the findings and recommendations of the disposition report. The court set the six-month review hearing on April 15, 2014.

The six-month review report recommended further reunification services for mother. The minor was doing well in placement, but still received therapy for "anxiety

5

and sadness." Mother was making progress in services, but still needed the structure of a residential treatment program; after completing that program, she needed to obtain suitable housing, maintain sobriety, and show that she could function in society.

Mother was currently on 36 months of formal probation following convictions of felony vehicle theft and receiving stolen property in October 2013. She was in a residential treatment facility and reported being clean for 130 days. After completing six months of treatment in April, she would continue as an outpatient while seeking her own residence. She had drug tested negative for probation. She was currently unemployed and applying for SSI. As her recovery progressed, her visits with the minor had improved.

Mother was recently diagnosed with hepatitis C and was waiting to begin Interferon treatment. She was also seeking diagnosis and treatment for a variety of other health concerns.

Having unexpectedly lost a sister in September 2013, mother had become closer to her biological mother and stepfather. Mother now wanted to maintain sobriety and gain strength from her family.

At the combined six-month and 12-month review hearing on April 15, 2014, maternal great-aunts Valarie C. and Kathi D. appeared, but were asked to leave the courtroom after mother's counsel asserted that they were not supportive of mother. The juvenile court advised them to contact the Department if they had information for the court that would be helpful for the minor. The court then adopted the findings and recommendations of the six-month review report.

Also on April 15, 2014, Valarie C. filed a request for de facto parent status. She stated that the minor had lived with her and she had had day-to-day responsibility for the minor's care from February 2013 to August 2013, with monthly visits thereafter. She claimed that she had information about the minor that others might not have, to wit: "Some [m]edical, behavioral, history while living w[ith] her mother, [half] brother and

6

[half] sister. History while in a relationship with [the minor's] father." In an attachment, she stated further:

"[The minor] is my biological great n[ie]ce. Alicia [G.] is her mother. There's 33 years of history re [mother] that at times directly affe[c]ts [the minor]. [The minor] was detained originally by Santa Clara CPS. They contacted my husband and I inquiring [*sic*] us to take [the minor] as care givers. With the S[anta] Clara [social worker] attending a phone conversation [mother] made to myself, [mother] asked if my husband Nick and I [would] care for [the minor] while she went to rehab, [to get] clean and sober and take care of her legal matters. Because of [mother]'s escalating drug, alcohol & mental health issue we were <u>NOT</u> on good terms. [Mother] apologized for everything and [the minor] came to live w[ith] Nick and myself. I got [the minor] enrolled w[ith] a counselor . . . at Behavioral [H]ealth, attempted to get [the minor] settled emotionally, address her health . . . , as well [the minor] was enrolled by ourselves [into] Pee Wee Preschool part time. During the entire time [the minor] was w[ith] us [mother] taunted, har[]assed, threatened, lied about us, etc. [The minor] bonded emotionally with myself and my husband Nick. I was at her birth. [Mother] is apparently calling the shots[,] i.e. that I can visit [the minor] 1 [time] month[l]y supervised. This is not in [the minor']s best interest. We are not kept up re [the minor] on any level. In court on [April 15, 2014,] I was asked to leave as [mother] states I am not a support. During her drug us[e,] she wouldn't allow us to be a support to her. [The minor] is our main concern."

On April 17, 2014, maternal great-aunt Kathi D. wrote to the juvenile court in support of the de facto parent request.

On April 18, 2014, the juvenile court placed Valarie C.'s request on calendar.

The de facto parent request was heard on June 5, 2014. Mother and father opposed the request; the Department and the minor did not.

Mother's counsel asserted that Valarie C. had no information sufficiently current to assist the court. Furthermore, there was a battle within the family, and mother did not

7

even want Valarie C. and Kathi D. in the courtroom, let alone participating in the proceedings.

The Department's counsel argued that it would not be in the minor's best interest to have her ties to Valarie C. severed, which might happen if de facto parent status were denied.

Called to testify, Valarie C. stated that she was present at the minor's birth. She and her husband had custody of the minor from February or March 2013 to the beginning of August 2013. She had previously had contact with the minor when the minor was in Kathi D.'s care, and prior to that "for many months until there was a falling out between [mother] and [Valarie C.] regarding personal situations of [mother's] living conditions with [the minor]'s father."

For about a year, Valarie C. did not have consistent contact with the minor, despite making efforts to see her. When Valarie C. did have contact, Kathi D. would bring the minor to Valarie C.'s house, or she would go to Kathi D.'s house, for full-day visits on consecutive days.

When Valarie C. had custody of the minor, she and her husband got the minor into therapy as soon as possible because of her evident insecurity; they also arranged medical and dental care and got her into part-time preschool on the therapist's recommendation. "It was a day-to-day, every-day situation of trying to meet the needs of [the minor] emotionally, medically and just try to provide an environment for her to be a child."

Currently, Valarie C. and her husband were restricted to one hour per month visitation. At each visit the minor stated that she was "not done;" she wanted them to stay. The last time, she said to the foster mother: "I want grammy to come with me.

Can grammy come to my house?  Grammy, you come."  The social worker told Valarie C. that mother made the decision to restrict visitation to once a month.**3**

Valarie C. understood that the case was in the reunification stage.  If granted de facto parent status, she would respect the fact that the goal was to reunify the minor with mother.

According to Valarie C., mother was not on good terms with the family.  Valarie C. called mother in October 2013 because of the sudden illness of mother's sister.  They had not spoken since.  Mother had not contacted her, and she would not know how to contact mother.

When Valarie C. had custody of the minor, mother "taunted, harassed, threatened, [and] lied about" Valarie C. and her husband.  There was "a constant barrage of phone calls," in-person harassment, and threats in text messages and on Facebook.  Mother charged falsely that Valarie C. and her husband were on drugs, that they murdered mother's sister (who actually died after a major stroke), and that they kidnapped the minor.  Valarie C. asked for the minor to be moved out of her home not only because of her own health concerns, but also because the minor was not thriving due to "the constant dynamics from" mother.

Valarie C. sought de facto parent status because she and her husband were previous caregivers of the minor, attended all hearings until told by the Butte County social worker that they could not do so, and "possessed and do possess" information about the minor.  She had met the current foster parents before the minor was moved to

---

**3** The Department's counsel stated that the juvenile court had ordered the current visitation schedule in November 2013, allowing only for supervised visitation for Valarie C. and her husband, after mother's counsel had requested that there be no visits between Valarie C. and the minor.  The court agreed with this account.

their home; since then, she had met them at visits with the minor. She did not have current information about the minor, other than what the minor shared in visits.

The juvenile court ruled as follows:

"Well, the Court did benefit from the testimony and the questions by counsel. And reviewed the provisions of the CEB and having previously read cases discussing the de facto parent status and its role in the juvenile dependency proceedings, and it seems that the goal is the avenue to become a de facto parent is to provide the privilege to a person who has developed a relationship with the child where there's bonding[,] and from that relationship information that can assist the Court in meeting the child's needs[,] and to help protect the independent interest of a person who developed a history of companionship and care while they have custody of the child[,] and that those views can be—where they can be of assistance to the Court, that they are available to be considered by the juvenile court, that the Court here finds that there is a bond that is established between [Valarie C.] and [the minor]. It's substantial in that it started at birth and developed consistently over time through substantial contact and care by [Valarie C.] for [the minor], and it's a recent bond that [Valarie C.] is pursuing ongoing contact with [the minor] and that their visits are going well from what the Court sees from the report and testimony. [Valarie C.]'s involvement in [the minor]'s life seems to be a comfort to [the minor] as demonstrated by the quality of the visits, although they are limited in their time of duration given the circumstance here.

"[Valarie C.]'s information about the instability in [the minor]'s early years is helpful to the Court in assessing [the minor]'s needs. The Court considered the risk that if the Court were to grant the petition and allow [Valarie C.] the de facto parent status, that that would simply have fanned the fire of discontent that clearly is ongoing between [mother] and [Valarie C.] But the Court's concern is that [the minor] should not miss out on an already-established relationship that benefits [the minor], that she enjoys[,] simply because [mother] and [Valarie C.] are not currently on good terms for reasons that[ are]

10

known between the two of them.  The Court's concern—so I've considered that and I've weighed that.  However, I think the benefit to [the minor] outweighs [*sic*] and that [the minor] should not miss out on the benefit of having someone who is familiar with her early history being available to attend court and be aware of the proceedings.  So I am going to grant the application; however, the Court understands that the Court has the authority to control discovery and it would be the Court's intention that if there's—the confidential report would not be automatically available to the de facto parents.  There would be notice here under [section] 827 as to whether confidential information could be provided to [Valarie C.], but the Court would assume that and allow [Valarie C.] to be provided status information, what stage the case is in, attend the hearings, and provide input if requested by Children's Services.

"So I think that then concludes that issue that the Court is affording the de facto parent status with the limitation on discovery that I just discussed."

The court subsequently added:  "I would say what I want to state in the Court's ruling, too, is the Court is mindful that in the dependency proceedings, we pursue extended family of children for a variety of reasons.  That includes concurrent plan but also continuity for the child as they're spending their time in foster care so that continuity of contact with family, extended family that they've already had a relationship with is helpful to the children in most cases.  And where it's not, then we limit that contact.  It's also helpful that—continuity is helpful to the Court in understanding the history and needs of the child, and the Court considers those factors as well in granting the application today."

## II.  DISCUSSION

Mother contends that allowing de facto parents to be parties to juvenile dependency proceedings violates federal and state constitutional guarantees of substantive and procedural due process for parents.  We are not persuaded.

11

At the outset, we agree with mother that she may raise this constitutional question for the first time on appeal. Her due process challenge presents a question of law that does not involve the resolution of disputed facts. Such questions are subject to de novo review. (*In re A.L.* (2010) 190 Cal.App.4th 75, 78.)

A.      *Due Process in Juvenile Dependency Proceedings*

"The federal and state Constitutions guarantee that no state shall deprive any person of life, liberty or property without due process of law. [Citation.] A parent's interest in the companionship, care, custody and management of his [or her] children is a compelling one, ranked among the most basic of civil rights. [Citation.] *Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.] The interests of the parent and the child, therefore, must be balanced.*" (*In re Marilyn H.* (1993) 5 Cal.4th 295, 306 (*Marilyn H.*), italics added.)

"*Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect.* [Citations.]" (*Marilyn H., supra*, 5 Cal.4th at p. 307, italics added.)

"It is axiomatic that due process guarantees apply to dependency proceedings. (*Santosky v. Kramer* (1982) 455 U.S. 745, 753-754 [71 L.Ed.2d 599, 606]; *Stanley v. Illinois* (1972) 405 U.S. 645, 658 [31 L.Ed.2d 551, 562-563].)" (*Ingrid E. v. Superior Court* (1999) 75 Cal.App.4th 751, 756-757.) However, "due process also is a flexible concept, whose application depends on the circumstances and the balancing of various factors. [Citations.]" (*Id.* at p. 757.)

12

"Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary legislation. [Citation.] *In substantive due process law, deprivation of a right is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; that is, the law must have a reasonable and substantial relation to the object sought to be attained.* [Citation.]" (*Marilyn H., supra*, 5 Cal.4th at pp. 306-307, italics added.)

"Significant [procedural due process] safeguards have been built into the current dependency scheme. They include representation by counsel to assist parents at every stage of the proceedings (§ 317), notice of all hearings and rights (§§ 307.4, 308, 311, 316, 335-336, 364-366.23) . . . ." (*Marilyn H., supra*, 5 Cal.4th at pp. 307-308.)

"What . . . are the due process attributes of a proper review hearing in the dependency system? Along with the important requirement of providing proper notice of such a hearing, the right to present evidence, and to cross-examine adversarial witnesses, i.e., the right to be heard in a meaningful manner, are the minimum. [Citations.]" (*In re James Q.* (2000) 81 Cal.App.4th 255, 265.)

B.     *De Facto Parenthood in Juvenile Dependency Proceedings*

In *In re B.G.* (1974) 11 Cal.3d 679 (*B.G.*), our Supreme Court established the right of de facto parents to appear as parties in juvenile dependency proceedings. The high court held: "The fact of biological parenthood may incline an adult to feel a strong concern for the welfare of his [or her] child, but it is not an essential condition; a person who assumes the role of parent, raising the child in his [or her] own home, may in time acquire an interest in the 'companionship, care, custody and management' of that child. The interest of the 'de facto parent' is a substantial one, recognized by the decision of this court in *Guardianship of Shannon* (1933) 218 Cal. 490 . . . and by courts of other jurisdictions and deserving of legal protection. [Citation.] [¶] . . . [¶] The juvenile court in a dispositional hearing must undertake 'a judicious appraisal of all available evidence

bearing on the child's best interests' . . . . [Citation.]  The presence of de facto parents will aid the court in that endeavor; the views of such persons who have experienced close day-to-day contact with the child deserve consideration; moreover, an award of custody to such de facto parents is often among the alternate dispositions which the court must evaluate.  [¶]  We conclude that de facto parents . . . should be permitted to appear as parties in juvenile court proceedings.  Their standing should not depend upon the filing of a petition for guardianship . . .[,] nor should their participation be restricted to the limited role of an amicus curiae; they should be permitted to appear as parties to assert and protect their own interest in the companionship, care, custody and management of the child." (*Id.* at pp. 692-693, fns. omitted.)

In *In re Patricia L.* (1992) 9 Cal.App.4th 61 (*Patricia L.*), the court set out criteria for determining who is entitled to de facto parent status:  "Whether a person falls within the definition of a 'de facto parent' depends strongly on the particular individual seeking such status and the unique circumstances of the case.  However, the courts have identified several factors relevant to the decision.  Those considerations include whether (1) the child is 'psychologically bonded' to the adult; (2) the adult has assumed the role of a parent on a day-to[-]day basis for a substantial period of time; (3) the adult possesses information about the child unique from the other participants in the process; (4) the adult has regularly attended juvenile court hearings; and (5) a future proceeding may result in an order permanently foreclosing any future contact with the adult.  [Citations.]  If some or all of these factors apply, it is immaterial whether the adult was the 'child's current or immediately succeeding custodian.'  [Citations.]  Because a court can only benefit from having all relevant information, a court should liberally grant de facto parent status.  If the information presented by the de facto parent is not helpful, the court need not give it much weight in the decision[ ]making process.  [Citation.]" (*Id.* at pp. 66-67, fns. omitted.)

14

De facto parents " 'are not equated with . . . parents or guardians for purposes of dependency proceedings and standing to participate does not give them all of the rights and preferences accorded [parents or guardians]. [Citations.]' " (*In re Kieshia E.* (1993) 6 Cal.4th 68, 77; accord, *In re B.F.* (2010) 190 Cal.App.4th 811, 817.)

"De facto parents are not part of any adversarial aspect of a dependency case." (*In re B.F., supra*, 190 Cal.App.4th at p. 817.) Unlike parents and minors, they do not have the right to cross-examine social workers and other witnesses. (*Ibid.*) They also are not automatically entitled to receive agency reports and other documents filed with the court. (*Ibid*.) They have standing to petition the juvenile court for the right to inspect or copy the case file, but may not actually inspect or copy the file without a court order. (*Id.* at p. 818.)

Rule 5.502(10) of the California Rules of Court[4] defines a de facto parent consistently with the *Patricia L.* test: " 'De facto parent' means a person who has been found by the court to have assumed, on a day-to-day basis, the role of parent, fulfilling both the child's physical and psychological needs for care and affection, and who has assumed that role for a substantial period."

Rule 5.534(e) provides: "On a sufficient showing, the court may recognize the child's present or previous custodian as a de facto parent and grant him or her standing to participate as a party in the dispositional hearing and any hearing thereafter at which the status of the dependent child is at issue. The de facto parent may: [¶] (1) Be present at the hearing; [¶] (2) Be represented by retained counsel or, at the discretion of the court, be appointed counsel; and [¶] (3) Present evidence." (See also rule 5.530(a), (b)(2).)

---

[4] Undesignated rule references are to the California Rules of Court.

*C.* *Substantive Due Process*

We conclude mother's constitutional challenge fails because she does not show how permitting de facto parents to act as parties infringes on any due process right guaranteed by the federal or state Constitution.

We begin with substantive due process, because it is mother's primary focus. Mother argues: (1) Since permitting de facto parents to act as parties infringes on a parent's fundamental liberty interest, it is subject to strict scrutiny; (2) De facto parenthood in juvenile dependency cannot survive strict scrutiny because it is neither necessary nor the least restrictive or least discriminatory means to accomplish its purpose. (See, e.g., *Simon & Schuster v. Members of the N.Y. State Crime Victims Bd.* (1991) 502 U.S. 105 [116 L.Ed.2d 476]; *Wygant v. Jackson Board of Education* (1986) 476 U.S. 267 [90 L.Ed.2d 260]; *Dawn D. v. Superior Court (Jerry K.)* (1998) 17 Cal.4th 932, 939-940 [Family Code presumptions of paternity].)[5] Mother's argument fails at the first step.

---

[5] In support of this point, mother cites a number of methods now provided by law for juvenile courts to obtain information that were not available in 1974, when *B.G.* was decided. These include: (1) the appointment of independent counsel for minors; (2) clearer and fuller statutory definitions of counsel's role; (3) the appointment of Child Abuse and Prevention Act (CAPTA) (42 U.S.C. § 5101 et seq.) guardians for minors; (4) the appointment of court appointed special advocates (CASA) for minors; (5) the caregiver's right to be present and be heard; (6) other relatives' right to be present and be heard; (7) the court's ability to admit any interested party to a hearing; and (8) the availability of relief by means of section 388 petitions.

Since we conclude that allowing de facto parents to appear as parties does not unduly infringe on any due process rights of biological parents, we need not consider whether any or all of these means could give juvenile courts the same information that de facto parents can provide. We note, however, that de facto parents' ability to provide information is not the only rationale for allowing them to participate in proceedings: The child's bonding to the de facto parent, and the desire to ensure that the de facto parent is not foreclosed from future contact with the child, are equally relevant. (*Patricia L., supra*, 9 Cal.App.4th at pp. 66-67.)

16

Mother cites no authority applying strict scrutiny to substantive due process issues in the juvenile dependency context, and we have found none. *Marilyn H., supra*, 5 Cal.4th 295, sets out the proper level of scrutiny in this context. Though mother purports to rely on *Marilyn H.*, she ignores its holding on this point, which we quote again here: "Substantive due process prohibits governmental interference with a person's fundamental right to life, liberty or property by unreasonable or arbitrary legislation. [Citation.] In substantive due process law, deprivation of a right is supportable only if the conduct from which the deprivation flows is prescribed by reasonable legislation that is reasonably applied; *that is, the law must have a reasonable and substantial relation to the object sought to be attained.* [Citation.]" (*Id.* at pp. 306-307, italics added.) This is not strict scrutiny. Nothing in this test requires the challenged law to be "necessary" or the "least restrictive or least discriminatory means" to achieve its purpose.

Furthermore, *Marilyn H.* makes clear why strict scrutiny would be unworkable as to the issue raised in this appeal. Parents are not the only parties with a fundamental liberty interest at stake in dependency proceedings: children also have such an interest. As the court explained: "A parent's interest in the companionship, care, custody and management of his [or her] children is a compelling one, ranked among the most basic of civil rights. [Citation.] Likewise, natural children have a fundamental independent interest in belonging to a family unit [citation], and they have compelling rights to be protected from abuse and neglect and to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child. [Citation.] The interests of the parent and the child, therefore, must be balanced." (*Marilyn H., supra*, 5 Cal.4th at p. 306.) "Although a parent's interest in the care, custody and companionship of a child is a liberty interest that may not be interfered with in the absence of a compelling state interest, the welfare of a child is a compelling state interest that a state has not only a right, but a duty, to protect. [Citations.]" (*Id.* at p. 307.) Mother's argument ignores the child's interest and the juvenile court's need to balance it

17

against the parent's interest. But even if the participation of de facto parents as parties had to meet a necessity test, a juvenile court in a particular case could well deem it necessary, in order to protect the child's compelling interest, to obtain information that only the de facto parents could provide, or to ensure by granting de facto status that persons essential to the child's well-being are not frozen out of the child's life. (*Patricia L., supra*, 9 Cal.App.4th at pp. 66-67.)

Lastly, mother's only actual argument for *why* allowing de facto parents to appear as parties infringes on biological parents' substantive due process rights is unpersuasive. Mother asserts: "The existence of a de facto parent as a party in a dependency proceeding creates an unreasonable governmental interference with a parent's fundamental liberty interest. *It creates an unbalanced playing field for the parent*. The dependency scheme already creates an adversarial situation often times between the parent and the Department as well as minor's counsel. A parent already has to face a state agency, adding a de facto parent as a party to the proceedings makes it so a parent also has to face a private party that has been created. This adds one more party and one more attorney that the parent potentially (and usually) has to oppose in court when nonparents who have an interest in the child can already provide information to the court without being a party to the case." (Italics added.) But mother cites no authority holding that substantive due process entitles a parent to a "balanced playing field." Nor does she explain why adding a de facto parent as a party (who may or may not be adversarial toward the biological parent) to gain information, or for any other reason consistent with the child's best interest, is fundamentally unfair in any way that differs from, e.g., the juvenile court's reliance on expert witnesses (whose opinions, if adverse to the parent, may weigh decisively against the parent).

In short, mother has shown no violation of substantive due process from the appointment of de facto parents as parties.

18

*D.      Procedural Due Process*

As to procedural due process, mother reiterates the contention, which we have already rejected, that making de facto parents parties unbalances the playing field against biological parents and is unnecessary as a method of giving the juvenile court information.  However, mother does not focus on the meaning of procedural due process in the juvenile dependency context.  She barely mentions the case law that defines parents' procedural due process rights in the juvenile dependency context: representation by counsel, notice of hearings, the right to present evidence, and the right to cross-examine adversarial witnesses.  (*Marilyn H., supra*, 5 Cal.4th at pp. 307-308; *In re James Q., supra*, 81 Cal.App.4th at p. 265.)  Mother also fails to explain how allowing de facto parents to appear as parties infringes in any way on those procedural due process rights.  Consequently, her argument is not persuasive.

Mother has failed to show any constitutional infirmity in the practice of allowing de facto parents to participate as parties in juvenile dependency proceedings.

*E.      Abuse of Discretion*

Mother contends that, even assuming it is constitutional to allow de facto parents to participate as parties, the juvenile court abused its discretion by granting Valarie C.'s request for de facto parent status.  We disagree.

The juvenile court makes its findings as to de facto parenthood by a preponderance of the evidence, and we review its findings for abuse of discretion.  (*In re Leticia S.* (2001) 92 Cal.App.4th 378, 381.)  We will not find an abuse of discretion unless the court "has exceeded the limits of legal discretion by making an arbitrary, capricious, or patently absurd determination.  [Citation.]"  (*Ibid*.)

Here, the juvenile court expressly based its ruling on the *Patricia L.* factors.  The court found:  The minor was psychologically bonded to Valarie C., who had assumed the role of a parent on a day-to-day basis for a substantial time; Valarie C. possessed unique information about the minor based on her earlier custody of the minor; Valarie C. had

19

attended all hearings; and Valarie C.'s involvement in the minor's life was a comfort to the minor, so far as the current restricted visitation schedule allowed. (Cf. *Patricia L., supra*, 9 Cal.App.4th at pp. 66-67.) The court acknowledged that mother and Valarie C. were not on good terms, but found that the benefit to the minor of Valarie C.'s participation in the proceedings outweighed the risk of "fann[ing] the fire of discontent" between mother and Valarie C. The court's determination was not "arbitrary, capricious, or patently absurd." (*In re Leticia S., supra*, 92 Cal.App.4th at p. 381.)

Mother asserts the juvenile court abused its discretion because: (1) The case was still in reunification and mother was compliant with her services; (2) Mother viewed Valarie C. as an obstacle to reunification and did not want her present at hearings; (3) Valarie C. did not have any unique information about the minor and only cared for her for four months; (4) Valarie C. already had a way to present information to the court without de facto parent status. Only the third point is relevant, and that point is without merit. As the court found, Valarie C.'s period of custody, as well as her other early contacts with the minor, gave her a unique insight into the minor's mental and emotional state at that time, which was vital to the court's assessment of the minor's history. Furthermore, mother cites no authority holding that four months' custody is insufficient to satisfy *Patricia L.*'s "substantial period of time" criterion, and we know of none. (*Patricia L., supra*, 9 Cal.App.4th at p. 67.)

Mother points out that Valarie C. admitted she did not have current information about the minor (other than what she learned during visits). However, *Patricia L.* does not hold that a de facto parent's unique information must also be current. In any event, as *Patricia L.* notes: "If the information presented by the de facto parent is not helpful, the court need not give it much weight in the decision[ ]making process. [Citation.]" (*Patricia L., supra*, 9 Cal.App.4th at p. 67.)

Mother's "concern" that Valarie C. was "unsupportive and an obstacle to reunification" is immaterial to whether Valarie C. could act as a de facto parent. In any

20

event, Valarie C. made clear that she understood the case was still in the reunification stage and supported that goal if mother could achieve it.

Mother's assertion that appointing Valarie C. as a de facto parent was "unnecessary" because there were other ways she could have given information to the juvenile court merely repeats an argument we have already rejected in the due process discussion above. It also has no bearing on whether the court abused its discretion by granting her de facto parent status.

Mother has not shown that the appointment of Valarie C. as a de facto parent was an abuse of discretion.

## III. DISPOSITION

The order appointing Valarie C. as a de facto parent is affirmed.

/S/

RENNER, J.

We concur:

/S/

RAYE, P. J.

/S/

HULL, J.

21